[No. 36384. En Banc. January 13, 1966.]

THE CITY OF TACOMA, *Respondent,* v. VERNE L. HEATER, *Appellant.* *

*Reported in 409 P.2d 867.

734

E. *Albert Morrison* and *Ronald L. Hendry,* for appellant.

*Marshall McCormick, Robert R. Hamilton, F. H. Chapin, Jr.,* and *Edward J. Guenther,* for respondent.

ROSELLINI, C. J.—The defendant was involved in a minor traffic accident. The officers who investigated the accident determined that the defendant was under the influence of intoxicants and took him to the city jail under arrest. The defendant denied that he was under the influence of intoxicating liquor. Upon arrival at the jail, the defendant requested permission to telephone his attorney, but was denied the right to do so.

The police officers then proceeded to administer certain physical and coordination tests to the defendant to ascertain his sobriety. The defendant refused to take a chemical sobriety test. He repeatedly renewed his request to telephone his attorney, but was not permitted to do so because the

police department's regulations permit officers to deny to a person charged with an offense involving intoxication the right to make a telephone call until after the expiration of 4 hours following his arrest.[1] Immediately after the tests were administered, the defendant was charged with the offense of driving while under the influence of liquor. He was not permitted to call his attorney until 4 a.m. on the morning following his arrest. The defendant's attorney stated that if he had been called he would have arranged for a blood test to determine the defendant's condition.

A jury found the defendant guilty as charged, and he appeals from the judgment entered on the verdict.

The issue to be determined on this appeal is: Is the denial of a request for permission to contact counsel as soon as a person is charged with a crime involving the element of intoxication, the denial of a constitutional right resulting in irreparable prejudice to his defense?

> In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel . . . . Const. art. 1, § 22 (amendment 10).

> In all criminal prosecutions, the accused shall . . . have the assistance of counsel for his defense. U.S. Const. amend. 6.

In *Gideon v. Wainwright,* 372 U.S. 335, 9 L. Ed. 2d 799, 83 Sup. Ct. 792, it was held that the following portion of the Sixth Amendment was incorporated into the due process clause of the Fourteenth Amendment, and is therefore binding upon the states:

---

[1]"Effective this date [October 1, 1954], every person arrested and placed in custody in the City Jail shall be afforded the opportunity as soon as possible to communicate by telephone with any person he desires as long as there is no toll charge.

"No Police Officer shall recommend to or influence any such person in custody in the selection of any person for him to call.

"No person charged with an offense, an element of which is intoxication, shall be denied the right of making such a telephone call after four hours have elapsed from the time of his arrest.

"(Note: Phone privileges shall *not* be extended to persons held under investigations, without consent of the Division concerned.)" Tacoma Police Department Regulation No. 46.

In all criminal prosecutions the accused shall enjoy the right . . . to have the assistance of counsel for his defense.

 We have followed the rule that where the language of the state constitution is similar to that of the federal constitution, the language of the state constitutional provision should receive the same definition and interpretation as that which has been given to a like provision in the federal constitution by the United States Supreme Court. *State v. Schoel*, 54 Wn.2d 388, 341 P.2d 481. Consequently, the *Gideon* case, *supra*, means that every defendant has a constitutional right to counsel in all criminal prosecutions. The court made no distinction between misdemeanors and felonies insofar as the applicability of this provision is concerned.

A defendant's right to be heard through his own counsel is unqualified. *Chandler v. Fretag*, 348 U.S. 3, 99 L. Ed. 4, 75 Sup. Ct. 1.

Prior to the *Gideon* case, *supra*, the Sixth Amendment was not considered a part of the Fourteenth Amendment. The Supreme Court applied the "fundamental fair trial" test to ascertain whether a conviction should be set aside where the defendant was deprived of counsel. In *Betts v. Brady*, 316 U.S. 455, 86 L. Ed. 1595, 62 Sup. Ct. 1252[2], the court stated:

> The Fourteenth Amendment prohibits the conviction and incarceration of one whose trial is offensive to the common and fundamental ideas of fairness and right, and while want of counsel in a particular case may result in a conviction lacking in such fundamental fairness, we cannot say that the Amendment embodies an inexorable command that no trial for any offense, or in any court, can be fairly conducted and justice accorded a defendant who is not represented by counsel.

In *Crooker v. California*, 357 U.S. 433, 2 L. Ed. 2d 1448, 78 Sup. Ct. 1287 (followed in *Cicenia v. LaGay*, 357 U. S. 504, 2 L. Ed. 2d 1523, 78 Sup. Ct. 1297, and *Culombe v. Connecticut*, 367 U.S. 568, 6 L. Ed. 2d 1037, 81 Sup. Ct. 1860),

---

[2]*Betts v. Brady, supra,* is overruled by *Gideon v. Wainwright, supra.*

the Supreme Court followed the rule in *Betts v. Brady, supra,* in finding that the "fair trial" concept had not been violated.

The "fair trial" rule created more problems than it solved. It encouraged prisoners throughout the country to ask for reviews by habeas corpus, in the hope that their cases would be reversed.

*Betts v. Brady, supra,* placed upon trial courts the burden of anticipating what view an appellate court might take in regard to the "common and fundamental ideas of fairness and right" in each case; and, the result was that many convictions were set aside in habeas corpus proceedings. This indicated that a definitive rule such as that laid down in the *Gideon* case, should be formulated to enable trial courts to enter judgments that would not be open to attack by habeas corpus on this ground.

Since the Sixth Amendment is now part of the Fourteenth Amendment, the "fair trial" rule is not determinative of the issue.

In *Hamilton v. Alabama,* 368 U.S. 52, 7 L. Ed. 2d 114, 82 Sup. Ct. 157, a new test was devised to ascertain when the right to counsel attaches. The right arises "at any critical stage in a criminal proceeding." In *White v. Maryland,* 373 U.S. 59, 10 L. Ed. 2d 193, 83 Sup. Ct. 1050, the Supreme Court held that a preliminary hearing was a "critical stage" in the Maryland proceeding. The reason for the court's holding appeared to be that a defendant's plea of guilty entered in a preliminary hearing without counsel, could later in the trial on the merits be introduced in evidence against him. Thus, the court found that the preliminary hearing was a "critical stage" and required counsel to be appointed for the accused for a preliminary hearing.

This is in accord with *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336, where state officers held an accused incommunicado for 19 hours and refused to permit him to make a telephone call to his wife or lawyer until

after he confessed. The Supreme Court held that his confession was involuntary and inadmissible under the due process clause of the Fourteenth Amendment.

In *In re Pettit v. Rhay,* 62 Wn.2d 515, 383 P.2d 889, we applied the rule of the *Hamilton* and *White* cases, *supra,* in granting a writ of habeas corpus and setting aside a conviction. We held that a "critical stage in a criminal proceeding" arose at a preliminary hearing where the defendant was denied counsel and the evidence adduced in the preliminary hearing was used to convict him of the charge.

An analogous case to the one at bar is *State v. Krozel,* 24 Conn. Supp. 266, 190 A.2d 61. A judgment of guilty was set aside, on the ground that the defendant had been denied his constitutional right to assistance of counsel. As in this case, the defendant was arrested on suspicion of driving while intoxicated. He was taken to the police barracks and given sobriety tests, after which he was charged with the offense. The defendant's requests that he be allowed to call his attorney and his wife were denied. This refusal was based on the policy of the police department to forbid any accused suspected of intoxication to make a call or to use a telephone for a 4-hour period after his arrest.

Another case is *In re Newbern,* 175 Cal. App. 2d 862, 1 Cal. Rptr. 80, 78 A.L.R.2d 901. The defendant was discharged from custody where he was denied an opportunity to procure a blood test on a charge of intoxication and thus was prevented from obtaining evidence necessary to his defense. The court held that this was a denial of due process.

In *Winston v. Commonwealth,* 188 Va. 386, 49 S.E.2d 611, where the defendant was arrested and jailed for driving while intoxicated, and was not brought before the committing authority for 4½ hours, and where the statute directed that the arresting officer produce the defendant "forthwith" before a committing authority, the charge had to be dismissed, the court stating at 395:

> It is perfectly apparent, too, from what has been said, that as a result of his illegal detention the defendant has been forever deprived of material evidence which might have supported his claim that he was innocent of the

charge under which he was held. According to the undisputed medical testimony, after the lapse of the time during which he was held in jail, a physical examination would have been useless and ineffectual.

And, also, at 397:

Since the opportunity denied the defendant of producing such evidence cannot be remedied at a new trial, we are of opinion that the judgment should be reversed and the prosecution dismissed.

In *State v. Johnson*, 87 N.J. Super. 195, 208 A.2d 444, the court held that detention of a suspected addict for 26 hours and refusal of his request to be examined by his own physician vitiates his conviction on a charge of being under the influence of narcotics. The court stated that:

the denial of an opportunity to be examined by a physician of his own choice, coupled with the 26-hour detention, constituted a deprivation of the right to defend his own liberty guaranteed by *Article I, paragraph* 1, of the *New Jersey Constitution,* . . . .

█ At what time was a "critical stage" reached in the defendant's case? It was no later than the moment when, immediately after the police officers had conducted their tests for sobriety and had interrogated the defendant, they charged him with the offense.

The denial of counsel at this point prevented the defendant's effective preparation for his defense to the charge against him. It was necessary for him to present evidence showing that he was not under the influence of intoxicating liquor at the time of his arrest. A most effective way to present such evidence would be through disinterested witnesses who could observe his condition soon after his arrest or after he had been booked for the crime, and by a blood test administered by a doctor. The evidence of intoxication dissipates with the passage of time. The 4-hour rule imposed by the police regulation recognizes that after 4 hours a person under the influence of intoxicating liquor will have reached a state of sobriety so that he is safe to be released, and may use a telephone.

The defendant had virtually no other way to obtain the necessary proof of his innocence.

■ The plaintiff urges that, because the defendant had access to other evidence tending to establish his innocence, the denial of his right to obtain the best evidence did not prejudice his defense. A jury is not likely to attach greater weight to the testimony of a friend of the defendant, whose inclination to aid him can be assumed, than to that of an arresting officer. It will not do to say that a person who is denied an opportunity to secure the most convincing kind of evidence has been deprived of a constitutional right but that such deprivation did not harm him.

It was essential to the effective preparation of his defense that the defendant be permitted to communicate with his attorney immediately after he was charged, in order to secure assistance of counsel in the pretrial period as required by the constitutional standards.

■ The Tacoma Police Department's regulation is also in conflict with a statute of this state. It will be noted that, while it authorizes police officers to prohibit a person charged with an offense, an element of which is intoxication, from personally making a telephone call before 4 hours have elapsed after his arrest, it does not authorize them to prohibit anyone else from communicating in his behalf with his wife, friends, or attorney during that period. Even so, the regulation does not conform to the mandate of RCW 9.33.020(5) which provides:

No officer or person having the custody and control of the body or liberty of any person under arrest, shall refuse permission to such arrested person to communicate with his friends or with an attorney, nor subject any person under arrest to any form of personal violence, intimidation, indignity or threats for the purpose of extorting from such person incriminating statements or a confession. Any person violating the provisions of this section shall be guilty of a misdemeanor. [1909 c 249 § 359 . . . .]

This statute is in harmony with the "critical stage" rule laid down by the Supreme Court in *Hamilton v. Alabama, supra.* The police chief of a city cannot by regulation repeal a statute passed by the state legislature; this power is reserved to the legislature only. Insofar as the police regulation is in conflict with the statute, it is void and of no effect.

Under the "critical stage" rule, the denial to the defendant of the assistance of his attorney after the officers had conducted their tests and questioning, violated his constitutional right to have counsel and due process[3], and any conviction obtained thereafter was void.

Applying the former "fair trial" test, the same result would be achieved because here the defendant was prevented from obtaining evidence which might tend to prove his innocence, and which evidence would have disappeared within 4 hours while he was held incommunicado. It clearly demonstrates prejudice.

The judgment is reversed and the action dismissed.

HILL, DONWORTH, WEAVER, HUNTER, and HALE, JJ., concur.

FINLEY, J. (dissenting)—"The criminal is to go free because the constable has blundered." Perhaps it might seem so, but the sentence has not been borrowed from a news tabloid. It is a terse, pithy evaluation by Cardozo, J., of the juristic problem involved in *People v. Defore,* 242 N.Y. 13, 150 N.E. 585. As an evaluation Cardozo's words can be interpreted reliably, but with more scope and better un-

---

[3] It is interesting to note how the protection of constitutional rights has been strengthened by recent United States Supreme Court decisions. See, *Eskridge v. Board of Prison Terms & Paroles,* 357 U.S. 214, 2 L. Ed. 2d 1269, 78 Sup. Ct. 1061 (1958); *Ross v. Schneckloth,* 357 U.S. 575, 2 L. Ed. 2d 1547, 78 Sup. Ct. 1387 (1958); *In re Woods v. Rhay,* 357 U.S. 575, 2 L. Ed. 2d 1547, 78 Sup. Ct. 1387 (1958); *Draper v. Washington,* 372 U.S. 487, 9 L. Ed. 2d 899, 83 Sup. Ct. 774 (1963); *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963). And, in *In re Horn v. State,* 52 Wn.2d 613, 328 P.2d 159, on June 27, 1959, by order of the District Court, sitting in Yakima, Geither Horn was released on a Writ of Habeas Corpus; and by Laws of 1963, Ex. Ses., ch. 21, § 2, p. 1415, 1429, he was awarded a state indemnity payment in the sum of $6,000 for unjust imprisonment.

derstanding if rephrased in two parts, as follows: (1) The courts have a responsibility and the authority to discipline or to police the police regarding suspect law enforcement activities adversely affecting the administration of criminal justice in the courts; (2) when the police blunder in the investigation, arrest, or incarceration of suspects, if enough of the criminal offenders involved are turned loose by the courts, the police, if not the criminals, will learn to behave themselves. As I see it, this paraphrasing of Cardozo is substantially applicable to the value judgments which underlie the majority opinion and to the result it brings about in the instant appeal.

From the foregoing it is obvious that I do not agree with the result reached by the majority, nor with most of the reasons given in support of that result. But I must say that I do agree with the majority on two matters: *First,* the courts do have a responsibility and the authority for taking corrective action respecting over-zealous, overly aggressive police practices which complicate and negate the prosecution of law violations and/or may unreasonably deprive the law violator of life, liberty, and the pursuit of happiness without due process of law. Corrective action, however, *does not necessitate turning criminal offenders loose as a form of shock treatment for the police.* Such judicial experimentation has too little, if any, propensity to produce the intended results; and furthermore, in my judgment, such experimentation is too inimical to other social values and too dangerous to society and law-abiding citizens to be indulged by the judiciary.

In this vein, corrective action might well include the use of contempt citations and the initiation of court proceedings against the offending public officials in specific criminal cases involving instances of over-reaching, over-zealous police activities.[4] Such was suggested years ago by one of the greatest of legal scholars, the late John Wigmore. In a related context he observed:

---

[4]Blumrosen: Contempt of Court and Unlawful Police Action, 11 Rutgers Law Rev. 526 (1957).

"The natural way to do justice here would be to enforce the healthy principle of the Fourth Amendment directly, i.e. by sending for the highhanded, over-zealous marshal who had searched without a warrant, imposing a thirty-day imprisonment for his contempt of the Constitution, and then proceeding to affirm the sentence of the convicted criminal." 8 Wigmore, Evidence § 2184a, n. 1. (McNaughton rev. 1961)

Another plausible alternative to judicial efforts to regulate inappropriate police conduct would be legislative establishment of state commissions on police administration. Such a commission would be composed of high caliber, nonpartisan professional and lay people. The commission would be authorized to receive complaints of allegedly serious misconduct by the police, involving, for example, denial of counsel, unreasonable search and seizure operations, and other transgressions of the constitutional rights of criminal defendants. This quasi-judicial administrative body would hold public hearings and take testimony in order to properly evaluate complaints of infringement of due process rights by the police. In appropriate circumstances the commission would be authorized to require police administrative officials to impose disciplinary measures in the form of reprimand, censure, or suspension without pay for the offending law enforcement officer. The commission could conceivably be further empowered to assess compensatory damages against a municipality, county, or state for aberrational conduct of law enforcement officers.

In addition, such things as better training for policemen, improved tenure, and increased compensation and retirement benefits might also have a surprisingly constructive and corrective effect. In any event, with the effectuation of appropriate administrative controls relative to infringement of due process rights, the present need or justification for judicial dismissal of criminal prosecutions should be eliminated or lessened considerably.

*Second,* I certainly agree with the majority that, considering the circumstances in this case, the action or conduct of the police in denying Mr. Heater's request that he be

allowed to telephone his attorney was most questionable and inappropriate. In fact, the denial of Mr. Heater's request was indefensible, and considerably more uncomplimentary characterization would be apt. This viewpoint is supported, I believe, by several considerations. There is no evidence, or contention based thereon, that Mr. Heater physically and/or mentally was unable to operate and to use the telephone because of intoxication or otherwise. Furthermore, after he was questioned, processed, and booked by the police, no proper law enforcement purpose was served by denying him reasonable access to his attorney via the telephone. At that point, the police already had made a case of drunk driving against Mr. Heater or they never would be able to do so. He had no criminal associates and was not aided and abetted by anyone in his violation of the law. So, the orthodox claim cannot be asserted in favor of the police that further investigation and further interrogation of Mr. Heater were necessary (a) to button up a case against him and (b) to ascertain and arrest confederates, before permitting him to contact his attorney. Even the limited availability of telephone facilities at the "pokey," plus a rash of late evening customers to be interviewed, processed or booked (by the limited police personnel on night duty) would be no excuse for withholding (for 4 hours or even a lesser period) reasonable access to telephone facilities from any citizen (substantially possessed of his faculties) under circumstances comparable to those pertaining to Mr. Heater. But again, it does not follow, and certainly I cannot agree, that this case should be dismissed and Mr. Heater absolved of his irresponsible and dangerous anti-social proclivities and conduct.

I have signed the dissenting opinion and agree substantially with the views expressed therein by Hamilton, J. However, I feel compelled to discuss at some length certain strongly held views of my own, apropos of certain points made and the general approach employed in the majority's resolution of the basic problem in this appeal.

The majority and I part company at the very outset with respect to the proper basic approach to problems such as

the one before the court in this appeal. Simply stated, it is my conviction that there is a choice between (a) *presuming prejudice absolutely* or *conclusively* when given certain basic facts or (b) *determining if prejudice resulted* only after a thorough consideration and evaluation of the entire fact pattern involved. Mr. Justice Clark has noted that such a choice confronts the United State Supreme Court in all cases involving alleged denials of due process:

> It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves *such a probability that prejudice will result that it is deemed inherently lacking in due process.* (Italics mine.) *Estes v. Texas,* 381 U.S. 532, 542 (1965). ,

With respect to right to counsel cases, Justice Clark has stated:

> Likewise in *Gideon v. Wainwright,* 372 U. S. 335 (1963), and *White v. Maryland,* 373 U.S. 59 (1963), we applied the same rule, although in different contexts. *Estes v. Texas, supra,* p. 543.

Does it necessarily follow that prejudice *should be presumed* in each and every instance in which there is a denial of a request to speak to counsel? I think not. Furthermore, I think that conclusion is definitely unwarranted in view of the facts involved herein. The reasons which supported a conclusion of inherent prejudice in fact patterns such as the one involved in *Gideon* are not to be found in the record of the instant case.

I have heretofore characterized the actions of the police in the instant matter as "indefensible." But, in my judgment, the majority too readily concludes that it must *inevitably* follow that Mr. Heater suffered irreparable prejudice as a result of the ill-advised police conduct in the instant matter. Instead, I would prefer to examine carefully *all* of the facts in order to determine whether prejudce resulted.

Virgil Heater was the driver of a car involved in a Tacoma city street intersection collision with another auto-

mobile. Fortunately for all concerned, the accident was apparently a minor one in terms of personal and property damage. Mr. Heater was charged with and, in the vernacular, was convicted of drunk driving. In appealing from this conviction, he asserts that the Tacoma police denied him the right to legal counsel for a period of 4 hours after he was arrested and booked on the charge of drunk driving. Apparently, this action of the police was pursuant to a standing regulation of the department applicable to anyone charged with being intoxicated. It is contended (ostensibly in a Fourteenth Amendment criminal due process constitutional context) that legal counsel (a) would have had a chemical blood-alcohol test made by medical experts pertaining to Mr. Heater's condition during the 4-hour period he was incarcerated, (b) the test would have proved he was not under the influence, and (c) that after 4 hours, any such test is ineffectual as alcohol is dissipated or substantially thrown off by the human body in that period of time. In other words, it is appellant's contention that denying him the right to counsel, when equated with and inextricably related to the unavailability of a chemical blood test indicative of his condition within the crucial 4-hour period after his arrest, constituted irreparable prejudice to his defense against the charge of driving while drunk. At the trial of Mr. Heater, a police investigation report was admitted into evidence, pursuant to stipulation of counsel. This report, plus the testimony of appellant Heater, establishes the following: He had taken the day off from work to try out his new car; he admitted having a glass of beer and a glass of tomato juice at the Family Tavern at about 6:30 p.m.; he left there and drove to the Parkway Tavern, a short distance away, arriving about 7 p.m. There he had three glasses of beer which, according to him, were small 15-cent glasses; this consumed about 45 minutes, after which he became sick and went to the lavatory. Appellant blamed this on stomach trouble—ulcers. He was in the lavatory about three quarters of an hour. The bartender came in to see what was wrong. Appellant advised the bartender that he wanted to stay there until he felt better. However,

appellant agreed to leave, went out to his car, turned on the radio, and went to sleep for 2 hours. As to this the record shows appellant testified:

Q How long did you sit there? A For two hours. In fact, I went to sleep. Listening to the music, I fell asleep. When I woke up I felt a lot better, but still bad, and I wanted to get home. . . . I started the car and went toward home, and going out Broadway . . . .

Incidentally, with reference to Mr. Heater's admitted consumption of beer, the closely related circumstances (a) that he became "sick at the stomach" and (b) that he fell asleep in his automobile for 2 hours could logically lead one to infer that he simply had too much—in fact, much too much—to drink. The sage counsel of experts and the results of sundry scientific tests are hardly needed to determine whether two plus two is equal to four.

Shortly after the appellant awakened and started to drive home, the intersection automobile collision occurred; appellant was subsequently arrested and taken to the police station. He promptly asked permission to telephone his lawyer. This was refused. He was booked. Subsequent requests to contact counsel were denied for approximately four hours in conformity with the aforementioned Tacoma Police Department regulation. At about 4 a.m., Mr. Heater was allowed to telephone Mr. Morrison, his lawyer, who thereupon promptly arranged bail through a professional bail bondsman.

Going back for a moment: Just after appellant's arrival at the police station, he was offered an opportunity to take the Harger-sobriety-test. He refused, but did submit to other sobriety tests administered by police officers. The police report, admitted in evidence *without objection,* specifically reads, in part:

Driver one [appellant] was removed to the station and offered the Harger Test, which he refused. Driver one was given the alcoholic influence tests, with poor results, which confirmed the original opinion of the officers. He was charged with drunk, and drunk and reckless driving, and booked into the City Jail.

. . . . It was noticed in the station that his breath was strong, his face flushed, his clothing was orderly. His attitude was polite and cooperative. At times he was combative. His eyes were bloodshot, the pupils had poor reaction to light. His balance was swaying. His walk was swaying. Turning was uncertain. Finger-to-nose test, uncertain. Picking up coins he did well. His speech was fair, but slurred.

On cross-examination, appellant, *without objection*, testified specifically as follows:

A I was just driving around town. I had a new car. I was mostly not visiting, just driving around town. Q I see. The day of the accident, when you were arrested, was Thursday. What is your normal day off? A My normal day off is Saturday and Sunday. Q Why hadn't you worked that day? A I didn't want to. I took the day off. I had a new car and figured I'd been working enough, so I just took the day off. Q Mr. Heater, do you have a problem with drinking? Are you an alcoholic? A No, sir, I don't believe so. Q Have you ever been convicted of a crime? A Yes, I have. Q When? A In 1936, I believe it was. Q What were you convicted of? A Felony —larceny. Q Anything else? A That's all. Q Let me ask you. Were you not convicted in May, 1949, of being intoxicated in an automobile? A Oh, yes. That, yes. Q Weren't you convicted in August, 1953, of driving while under the influence, and reckless driving? A I guess so, if you have it there. Q Were you not also convicted in June, 1954, of negligent driving and of not having an operator's license because it was revoked? A I guess so. Q In October of 1954, were you not also convicted of operating a motor vehicle under the influence, and reckless driving? A Yes, I suppose so. Q In December, 1959, weren't you again convicted of the same offense? A If he has the record there. I don't remember that. Q You don't remember being convicted in 1959 of drunk and reckless driving? A Yes. Q You were? A Yes.

The issue on this appeal is characterized by the majority as follows: Is the denial of the request for permission to contact counsel as soon as a person is charged with a crime involving the element of intoxication the denial of a con-

stitutional right resulting in irreparable prejudice to his defense?

Counsel for Mr. Heater, as emphasized hereinbefore, seems to stand flatly on the proposition that medical evidence of a blood test was the best and the only reliable evidence available to defend his client. But this is simply not true. Mr. Heater was afforded an opportunity to take a Harger-sobriety-test shortly after he arrived at the police station. His entire thesis in this appeal is that he was not intoxicated. If this is true, then he had control of his faculties. In view of his allegedly sober status, Mr. Heater presumably could have ascertained whether or not the Harger test was properly administered by the police officers. Its results would have been available to him as a part of his defense at the time of trial, through his own testimony, or otherwise. With his record of drunk driving convictions, it would seem likely that the Harger test, the proper technique for its administration, and its efficacy in determining sobriety, would not have been a mystery beyond his comprehension. It is significant, I think, that no effort whatsoever was made to introduce other evidence to counter the charge of drunk driving against Mr. Heater. The record shows he had seen a number of people during a period of several hours prior to the accident. Of these, some doubtless had seen and would have remembered Mr. Heater and the state of his health and sobriety. It appears to me quite reasonable and rational, rather than inconceivable, that some of these people would have been available as witnesses. Charges of drunkenness have been asserted, proved and disproved in a variety of forums, including the courts, for generations before the advent of chemical blood-alcohol tests.

Appellant's claim is quite shaky in other respects. It requires rather tenuous assumptions, speculation and conjecture to the effect that: (1) Attorney Morrison would have been pleased to accept legal employment from Mr. Heater via telephone between the hours of 11:30 p.m. and 2 or 3 a.m.; (2) that the attorney would not simply have telephoned a professional bondsman, arranged bail and

advised Mr. Heater to take temporary advantage of the sleeping quarters and other public accommodations at the Tacoma City Jail; (3) that Mr. Morrison immediately would have undertaken a time-consuming personal work assignment; (4) that he would have telephoned a doctor; (5) that the doctor in the best traditions of the Hippocratic oath would have (a) forsaken sleep and rest, (b) arisen to such an emergency in the wee hours of the morning, and (c) accompanied Mr. Morrison to the Tacoma City Jail to take a blood sample from Mr. Heater's steady and anxiously awaiting arm; (6) that the sample, upon being tested, would have shown Mr. Heater's bloodstream to be Simon pure, or at least that it contained less-than-excessive amounts of firewater; and (7) finally, that the foregoing chain of events inevitably would have exonerated Mr. Heater and required a dismissal of the charges against him.

Curiously enough, if the police had cooperated and had permitted Mr. Heater to telephone Attorney Morrison, but the latter had not been able to find a cooperative doctor or laboratory technician to take a blood sample, the resulting unavailability of evidence of a blood-alcohol test almost certainly would not now be urged as grounds for dismissal of the criminal charges and the conviction of the appellant.

With the foregoing area of speculation and conjecture in mind, and particularly with some awareness of certain missing links in the chain of relationship between (a) denial of the right to counsel and (b) the claimed significance of the unavailability of a blood-alcohol test, I think that only a simple question should be asked by this appellate court: Was Mr. Heater treated unfairly; *i.e.*, was he unreasonably prejudiced, through no fault of his own, by the denial of an opportunity to consult with counsel after he was booked by the police in the instant case? Considering some imponderables, as well as ponderables, *suggested by the entire record in this case*, the question posed can be rationally and reasonably answered, I think, in the negative. In other words, in a due process of law context, I conclude that the denial of counsel under the circumstances in this case *did not absolutely and irreparably*

*prejudice Mr. Heater from defending himself against the charge of drunk driving.*

The foregoing discussion constitutes an effort to consider and determine whether or not, in view of the entire record, Mr. Heater was prejudiced by the denial of counsel. The majority opinion impliedly, if not expressly, rejects this alternative in favor of an approach which *conclusively* attributes or presumes prejudice to the defendant—given the basic facts, with heavy emphasis upon the denial of counsel and the alleged right to have a blood test performed during the 4 allegedly crucial hours.

I would most strongly disagree with any contentions that the approach and the holding of the majority are required or in fact made legally mandatory as a result of recent United States Supreme Court decisions concerning the right to counsel. Based upon the fact patterns in each of the following cases, I readily agree that in *Gideon v. Wainwright,* 372 U.S. 335, 9 L. Ed. 2d 799, 83 Sup. Ct. 792, *Hamilton v. Alabama,* 368 U.S. 52, 7 L. Ed. 2d 114, 82 Sup. Ct. 157, and *White v. Maryland,* 373 U.S. 59, 10 L. Ed. 2d 193, 83 Sup. Ct. 1050, denial of the right to counsel was highly prejudicial and, consequently, was appropriately held to be a violation of criminal due process constitutional safeguards. While I think the decisions in those cases were eminently just, right, and proper; nevertheless, I reach the conclusion that they are not strictly applicable and certainly do not require results attributed to them by the majority in the instant case.

I agree with the majority that the *Gideon* case, *supra,* constitutes a departure from the previous decision of the court in *Betts v. Brady,* 316 U.S. 455, 86 L. Ed. 1595, 62 Sup. Ct. 1252. But, I think that the majority takes too much of a giant step, and an unwarranted one, in concluding that *Gideon* and other decisions of the United States Supreme Court (up to the present time) clearly support or require a decision as far reaching and extreme as the majority's in the instant case. Perhaps there are some dicta in the *Gideon* case which give encouragement and support to the conclusion reached by the majority in the instant case.

However, the decision in *Gideon* should be given effect, I think, in relation to the facts in the *Gideon* case. It is a guide, and should be binding and controlling only in those subsequent cases where there is an identity—or at least a close parallel or comparability in terms of factual patterns. The denial of counsel in the *Gideon* case did *not* occur at the time of arrest and booking by police, but much later—at the time of trial. So there may be no mistake about this, I set out the facts by quoting from the *Gideon* case as follows:

Petitioner was charged in a Florida state court with having broken and entered a poolroom with intent to commit a misdemeanor. *This offense is a felony under Florida law. Appearing in court without funds and without a lawyer, petitioner asked the court to appoint counsel for him, whereupon the following colloquy took place*:

"The COURT: Mr. Gideon, I am sorry, but I cannot appoint Counsel to represent you in this case. Under the laws of the State of Florida, the only time the Court can appoint Counsel to represent a Defendant is when that person is charged with a capital offense. I am sorry, but I will have to deny your request to appoint Counsel to defend you in this case.

"The DEFENDANT: The United States Supreme Court says I am entitled to be represented by Counsel."

*Put to trial before a jury, Gideon conducted his defense about as well as could be expected from a layman.* He made an opening statement to the jury, cross-examined the State's witnesses, presented witnesses in his own defense, declined to testify himself, and made a short argument "emphasizing his innocence to the charge contained in the Information filed in this case." The jury returned a verdict of guilty, and petitioner was sentenced to serve five years in the state prison. (Italics mine.) 372 U.S. 335, 336.

There is no doubt that *Gideon* does specifically overrule the prior decision of the court in the case of *Betts v. Brady, supra.* But again, it behooves us to look to the facts, and to carefully analyze the opinions in *Betts v. Brady* and in *Gideon* before concluding what may be required in the instant case from the action of the United States Supreme

Court in overruling *Betts v. Brady*. In the *Gideon* opinion the United States Supreme Court states further:

The facts upon which Betts claimed that he had been unconstitutionally denied the right to have counsel appointed to assist him are strikingly like the facts upon which Gideon here bases his federal constitutional claim. *Betts was indicted for robbery* in a Maryland state court. *On arraignment, he told the trial judge of his lack of funds to hire a lawyer and asked the court to appoint one for him.* Betts was advised that it was not the practice in that county to appoint counsel for indigent defendants except in murder and rape cases. *He then pleaded not guilty, had witnesses summoned, cross-examined the State's witnesses, examined his own, and chose not to testify himself. He was found guilty by the judge, sitting without a jury, and sentenced to eight years in prison.* Like Gideon, Betts sought release by habeas corpus, alleging that he had been denied the right to assistance of counsel in violation of the Fourteenth Amendment. Betts was denied any relief, and on review this Court affirmed. *It was held that a refusal to appoint counsel for an indigent defendant charged with a felony did not necessarily violate the Due Process Clause of the Fourteenth Amendment,* which for reasons given the Court deemed to be the only applicable federal constitutional provision. The Court said:

"Asserted denial [of due process] is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." 316 U.S., at p. 462.

Treating due process as "a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights," the Court held that refusal to appoint counsel under the particular facts and circumstances in the *Betts* case was not so "offensive to the common and fundamental ideas of fairness" as to amount to a denial of due process. *Since the facts and circumstances of the two cases are so nearly indistinguishable, we think the Betts v. Brady holding if left standing would require us to reject Gideon's claim that the Constitution guarantees him the assistance of counsel.*

Upon full reconsideration we conclude that *Betts v. Brady* should be overruled. (Italics mine.) 372 U.S. 335, 338, 339.

Closely analyzed, the *Gideon* case held that an indigent charged with a felony under state law has a right and under the Fourteenth Amendment must be furnished legal counsel at public expense to represent and advise him *at the time of* the trial in a state court. Only dicta and subsequent law review and other editorial exposition thereof take *Gideon* any further than this.

As I read and construe the opinion of the United States Supreme Court in *Hamilton v. Alabama,* 368 U.S. 52, 7 L. Ed. 2d 114, 82 Sup. Ct. 157, it clearly and unequivocally stands for the proposition that the right to counsel is constitutionally significant under the Fourteenth Amendment due process clause in a state court *at the time of the arraignment* of a criminal offender *in a capital case.* The opinion does no less, but it does no more than this. But, even so, mention should be made of the somewhat unique fact, and I think it a significant one in terms of the meaning of this decision; namely, that at the time of arraignment of an accused in Alabama certain procedural rights and consequences are irrevocably determined under Alabama law.

The first paragraph of the court's opinion in *Hamilton v. Alabama, supra,* states:

*This is a capital case,* petitioner having been sentenced to death on a count of an indictment charging breaking and entering a dwelling at night with intent to ravish. *Petitioner appealed, claiming he had been denied counsel at the time of arraignment.* (Italics mine and footnote omitted.)

And it is further stated in the opinion:

Whatever may be the function and importance of arraignment in other jurisdictions, we have said enough to show that in Alabama it is a critical stage in a criminal proceeding. What happens there may affect the whole trial. Available defenses may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes." (Footnote omitted.) 368 U.S. 52.

Referring to *Powell v. Alabama,* 287 U.S. 45, 69, 77 L. Ed. 158, 53 Sup. Ct. 55, 84 A.L.R. 527, the United States Supreme Court in the *Hamilton* opinion then states:

The guiding hand of counsel is needed at the trial "lest the unwary concede that which only bewilderment or ignorance could justify or pay a penalty which is greater than the law of the State exacts for the offense which they in fact and in law committed." *Tomkins v. Missouri,* 323 U.S. 485, 489. But the same pitfalls or like ones face an accused in Alabama who is arraigned without having counsel at his side. *When one pleads to a capital charge without benefit of counsel, we do not stop to determine whether prejudice resulted.* (Italics mine.)

The majority opinion in the instant case says of the opinion of the United States Supreme Court in *White v. Maryland,* 373 U.S. 59, 10 L. Ed. 2d 193, 83 Sup. Ct. 1050 (1963):

The reason for the court's holding appeared to be that a defendant's plea of guilty entered in a preliminary hearing without counsel, could later in the trial on the merits be introduced in evidence against him. Thus, the court found that the preliminary hearing was a "critical stage" and required counsel to be appointed for the accused for a preliminary hearing.

I think it is an overstatement, and incorrect, to say that the court held that the denial of counsel at the preliminary proceeding was *per se* crucial, and that a denial of counsel at that stage would be inherently prejudicial—regardless of what actually transpired. Actually, the crux of the decision in the *White* case, *supra,* is that a plea of guilty was entered without legal counsel and advice, and was usable—in fact, was admitted in evidence at the subsequent trial and conviction of the defendant. Thus, it is in relation to this facet of the case that the right to counsel at the preliminary hearing stage was significantly important and, under the circumstances, amounted to denial of Fourteenth Amendment criminal due process protection. In other words, the guilty plea entered without counsel had probative value at the subsequent trial. Under such circumstances, this was prejudicial and unfair to the defendant. This is

quite different, in my judgment, from concluding that the Fourteenth Amendment of the United States Constitution requires that the right to counsel is *per se significant in a due process sense,* and must be afforded to criminal offenders in any preliminary hearing *without inquiry and evaluation as to purpose, and in fact for any and every purpose whatsoever.*

In summary, the basic difference between my conclusions and those of the majority lies in the choice of approaches to the problem. Concisely stated, the demarcation point is probably whether or not *Gideon* and company necessitate a conclusion of inherent prejudice—and resulting dismissal of the convicted defendant—if, and when, counsel is denied at a "crucial stage." It is my conclusion that such a disposition should result if, and only *if, in view of the entire record* it can be determined that the particular defendant involved was in fact prejudiced by the denial of counsel.

In this connection I think it is the function of the courts, and a proper one, to consider the rights and the claims of an individual defendant, not in the abstract, but in relation to an inference of some worthy rights and interests claimed by organized society. This requires, as suggested in *Betts v. Brady, supra,* and as not completely disregarded in *Gideon v. Wainwright* and *Hamilton v. Alabama, supra,* a balancing of values, a weighing of interests and consequences.

The words, *due process,* like other conceptualistic language of the United States Constitution, are not self-defining, self-implementing, or applicable automatically. Life must be breathed into them; and content, substance and meaning must be accorded by the judiciary. This function was well understood by the founding fathers in formulating the Constitution as a basic, guiding document of government. The function is more and more recognized, even today, as an intended and proper one for which the judiciary has responsibility and authority. In the words of Mr. Justice Frankfurter in his concurring opinion in *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 162, the

concept of constitutional due process was elaborated as follows:

The requirement of "due process" is not a fair-weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens. But "due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, "due process" cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, "due process" is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.

Fully aware of the enormous powers thus given to the judiciary and especially to its Supreme Court, those who founded this Nation put their trust in a judiciary truly independent—in judges not subject to the fears or allurements of a limited tenure and by the very nature of their function detached from passing and partisan influences.

Cardozo, in the *Paradoxes of Legal Science,* implies that judges, in a sense, are like oracular-like arbiters, whose public role is the resolution or compromise of antitheticals—opposing values and concepts. In this frame of reference the instant case involves two antitheticals. On the one side there is the individual and his rights equated with concepts of liberty and freedom. On the other, there is society, group interests and rights, equated with the concepts of ordered liberty and freedom through government under law. The two considerations or abstractions, in one sense, can be separated as not related to each other. This, however, even conceptually for purposes of laboratory dissection, is unrealistic. Consideration of an indi-

vidual and his rights brings about, in fact, subtly precipitates, consideration of society or the rights of the group. This, in turn, leads to a consideration of the individual, not separate and apart, but as a member of society and the group, and vice versa. Few individuals have been able to resign from the human race or from society. Nor can they easily do so today. The planet has become too small. The two antitheticals hereinbefore posed, tentatively or at least forensically, are extremes. As posed, they suggest other relationships—a world in which liberty is absolute in contrast to a world in which no liberty exists (assuming these hypotheses are theoretically possible); an anarchistic society as against a totalitarian one; a world of no government and no rules in contrast to a world that is all rules and all government. Our American-way world, our government structure and its operation, attempts to avoid each of the polar extremes, emphasizing in the process the Golden Rule and the principle of the greatest good for the greatest number. This requires, of course, that a line be drawn by someone, somewhere between extremes, many times, in many situations, and over and over. Much of the responsibility and authority for performance of this line-drawing, balancing function is invested in the judiciary by our state and national constitutions.

In the instant case it seems to me that the appellant misconstrues the role of the presumption of innocence in the balancing process concomitant to any problem of due process. In my judgment, the scales of justice by reason of the presumption of innocence are not so weighted in favor of the accused as to require an appellate court—or even a trial court jury—to ignore portions of the evidentiary record which preponderately point toward the probability of guilt. While unquestionably a defendant's guilt must be proved beyond a reasonable doubt, his assertions on appeal of denial of due process (specifically in the instant case because of denial of the right to counsel) should not be conclusively *presumed* to be well taken. To reiterate: it is my judgment that the appellant

should be required to demonstrate that he was irreparably prejudiced by the denial of counsel.

Of course, claims such as those asserted by the appellant herein continually remind us of the dangers of a police state. There are even those who would, today, assert that there are signs of significant tendencies in that direction. But, in any *thinking* about this problem of government and its inherent dangers, the police and the courts, particularly the former, should not automatically be suspect and put on trial at the drop of a hat and as a matter of course in every case simply because of an allegation of denial of due process as to some aspect of criminal law enforcement activity. Assumptions that all policemen and law enforcement officers are fools, knaves, or sadistic brutes, as well as potential or actual agents of a police state, are just not true. Furthermore, the assumption that a balancing of values and the weighing of interests by the courts is a dangerous tendency in the direction of the police state, again, is just not true. The function is traditional, in fact inherent, in our Anglo-American common-law, constitutional system of jurisprudence. Responsibility and authority must be placed somewhere, even in a most ideally conceived and constituted working democracy. I do not think that the somewhat plenary and final responsibility and authority for balancing interests and making value judgments and decisions is misplaced in our appellate and other courts in this country. It is particularly reassuring that the work of the courts is continuously open to public scrutiny and criticism, and that judges, even if remotely, are aware of public opinion.

Before concluding, I must note strong disagreement with the reasoning of the majority that the denial of counsel by the police in the instant case was prohibited by, and constituted a violation of RCW 9.33.020(5). It seems very clear to me from a simple reading of RCW 9.33-.020(5) that it applies only in cases involving a confession and/or incriminating statements. RCW 9.33.020(5) reads:

No officer or person having the custody and control of the body or liberty of any person under arrest, shall refuse permission to such arrested person to communicate with his friends or with an attorney, nor subject any person under arrest to any form of personal violence, intimidation, indignity or threats *for the purpose of extorting from such person incriminating statements or a confession.* Any person violating the provisions of this section shall be guilty of a misdemeanor. (Italics mine.)

The instant case certainly *does not involve an extorted confession or incriminating statements.* Thus, the statute is not applicable in the instant case, and reference to it lends no support to the decision of the majority herein. My interpretation and application of RCW 9.33.020(5) is supported by the analysis of the statute found in decisions of this court in *State v. Haynes,* 58 Wn.2d 716, 364 P.2d 935 (1961), and in *State v. Miller,* 68 Wash. 239, 122 Pac. 1066 (1912).

In conclusion, I must again emphasize that society has some important rights and claims which must be balanced against the claims of individuals, such as Mr. Heater's claim of a denial of his criminal due process constitutional rights in this case. Society certainly has a right as a deterrent to anti-social conduct to impose sanctions, including fine and/or imprisonment, for those who would drive while intoxicated. Society has some right to expect, or at least to hope that the imposition of these penal sanctions should deter the convicted drunk driver from repeating his dangerous driving proclivities. To enhance highway safety society has a right to expect that repeated offenses such as driving while intoxicated will result in revocation of the offender's "right" (or "privilege") to use the public highways.

It is my best judgment that more convincing proof of deprivation of constitutional rights is required than has been demonstrated in the highly theoretical, speculative claim of appellant Heater. "The balance is not swayed until something more persuasive than uncertainty is added

to the scales."[5] If appellant is to be turned loose largely on the basis of recent decisions of the United States Supreme Court, I prefer to see this responsibility assumed directly by that Court. Considering the facts herein, I seriously doubt that a majority of the United States Supreme Court would vote to dismiss Mr. Heater's conviction. In any event, my vote is to affirm the trial court and to sustain the conviction of driving while intoxicated. In this respect, I have made a difficult but conscious evaluation and choice to consider the entire record and the surrounding circumstances, and to give some emphasis and perhaps priority to the rights of society as opposed to those asserted by Mr. Heater, hoping thereby to better safeguard the interests of the motoring public on the streets, byways, and highways of our state, without unreasonably and irretrievably prejudicing the rights of individual criminal defendants in drunk driving cases.

HAMILTON, J. (dissenting)—The majority order a dismissal of the charges of public intoxication, a misdemeanor, and driving while under the influence of intoxicants, a gross misdemeanor. I dissent. The reasons therefor require a brief resume of the events giving rise to this appeal.

On the evening in question, at approximately 11:15 p.m., in the city of Tacoma, defendant purportedly drove through a red traffic light and into another vehicle. Two city traffic officers investigated the accident. It appeared to them that the defendant was unsteady on his feet, that his eyes were bloodshot, that his speech was slurred, and that his breath reeked with alcohol. The officers formed an opinion that he was intoxicated and arrested him. On the way to the police station, defendant admitted to the consumption of three beers at a local tavern. Upon arrival at the police station, physical co-ordination tests were administered *with defendant's consent*. The results confirmed the opinion of the officers. The defendant again admitted to "three beers," but denied intoxication. He

---

[5]Cardozo, J.,: *People v. Defore*, 242 N. Y. 13, 150 N.E. 585.

further advised the officers he was not injured in the accident, was not ill, and had not visited a doctor or dentist recently. He was offered a Harger sobriety test, which he refused because he had previously been advised by his attorney not to submit to such tests if arrested for an offense involving intoxication. Thereafter, defendant was charged and placed in jail.

At intervals after his arrival at the police station, defendant requested permission to telephone an attorney retained by him. These requests were refused upon the basis of Tacoma Police Department Regulation No. 46 (see footnote 1). At 4 a.m., 4 hours after his arrival at the station, defendant was permitted to telephone his attorney. The attorney contacted a bail bondsman, who posted bail about 6 a.m.

Trial and conviction in Tacoma City Police Court ensued, from which defendant appealed to the superior court. Trial de novo before the superior court, sitting without a jury, followed. Prior to trial in each court, defendant interposed a written motion to dismiss the charges upon the ground that refusal of his request to timely contact counsel, following his arrest, amounted to a violation of his constitutional right to the assistance of counsel. He interposed no other motions and, in each court, a ruling upon his motion to dismiss was deferred until conclusion of trial.

In the superior court, evidence of defendant's appearance and behavior at the scene of the accident, the results of the physical co-ordination tests at the police station, and the manner of administering Police Department Regulation No. 46, as related to the degree of intoxication, was admitted by stipulation and without objection.

The defendant took the stand and testified to (a) spontaneously taking the day off from his employment because he felt he had worked enough and wanted to try out a new car and visit with friends, (b) visiting and indulging at two taverns, (c) getting sick at the second tavern— which illness he attributed to ulcers, (d) falling asleep in his automobile after departing the second tavern, (e)

driving to the point of the accident, his arrest and his state of sobriety, (f) his knowledge of the Harger sobriety test and his refusal to take it at the police station, (g) his requests for counsel, and (h) several previous convictions of driving while under the influence of intoxicating liquor. Defendant neither produced nor offered to produce any corroborative evidence concerning his activities during the day, his condition of sobriety in or about either tavern he visited or at the scene of the accident, or as to the existence of his ulcers and the effect thereof as the same related to his general health, appearance, coherency, equilibrium or driving capacity.

The attorney called by defendant from the police station then testified that had he been called immediately after defendant's arrest he would have undertaken to arrange a blood-alcohol test. He did not state he would have then rendered any other assistance.

At the conclusion of the evidence, defendant renewed his motion to dismiss the charges. The trial court entered findings of fact, conclusions of law, and judgment denying defendant's motion and adjudging him guilty of the offenses of public intoxication and driving while under the influence of intoxicating liquor.

Against this background, the majority state the question to be determined on this appeal as follows:

Is the denial of a request for permission to contact counsel as soon as a person is charged with a crime involving the element of intoxication, the denial of a constitutional right resulting in *irreparable prejudice* to his defense? (Italics mine.)

The majority then turn to the cases of *Hamilton v. Alabama*, 368 U.S. 52, 7 L. Ed. 2d 114, 82 Sup. Ct. 157 (1961); *Gideon v. Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799, 83 Sup. Ct. 792 (1963); *White v. Maryland*, 373 U.S. 59, 10 L. Ed. 2d 193, 83 Sup. Ct. 1050 (1963) (cases dealing with furnishing an indigent with counsel at the preliminary hearing or arraignment stage); and *Haynes v. Washington*, 373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963) (a case dealing with admissibility of a confession

obtained after denial of a request for counsel at the investigative state), and assert:

(1) The sixth amendment of the United States Constitution has, via the Fourteenth Amendment, been extended to the states, under *Gideon v. Wainwright, supra;*

(2) The "fundamental fair trial" test, as applied to determining when the constitutional right to counsel attaches under due process concepts, as utilized in *Betts v. Brady,* 316 U.S. 455, 86 L. Ed. 1595, 62 Sup. Ct. 1252 (1942), has been replaced by the "critical stage" test as found in *Hamilton v. Alabama, supra;*

(3) The "critical stage" in public intoxication cases, drunken driving cases, or any case involving the element of intoxication, is upon the booking or charging of the accused person; and

(4) The "sum total of the circumstances" test, as applied to determining the constitutional validity of any conviction, following a refusal to honor a request for counsel at the *investigative or accusatorial stage,* as utilized in the cases of *Crooker v. California,* 357 U.S. 433, 2 L. Ed. 2d 1448, 78 Sup. Ct. 1287 (1958); *Cicenia v. LaGay,* 357 U.S. 504, 2 L. Ed. 2d 1523, 78 Sup. Ct. 1297 (1958); and *Culombe v. Connecticut,* 367 U.S. 568, 6 L. Ed. 2d 1037, 81 Sup. Ct. 1860 (1961), has been, will be, or should be totally abandoned.

From these premises, the majority answer the question posed by stating:

> Under the "critical stage" rule, the denial to the defendant of the assistance of his attorney after the officers had conducted their tests and questioning, violated his constitutional right to have counsel and due process, *and any conviction obtained thereafter was void.* (Italics mine and footnote omitted.)

In dissenting, I agree with the first three premises advanced by the majority, but I cannot conscientiously agree with the wisdom, the import, or the everyday practicality of the result produced by the fourth. In short, I cannot agree that denial of a request for permission to contact counsel as soon as a person is charged with a crime involv-

ing the element of intoxication *invariably and irreparably* prejudices that person's defense to an extent compelling a dismissal of the charge.

At the outset, I have no quarrel with the proposition that, insofar as the police regulation in question purports to and does prohibit any reasonable and timely telephonic communication between one charged with intoxication and his attorney, a doctor, a friend, or a member of his family, the regulation is in conflict and incompatible with pertinent constitutional and statutory requirements and should be struck down. After such a person has been observed, questioned, and charged no proper law enforcement purpose is to be served by denying such a telephonic communication. Certainly, he should not be accorded unrestricted and unlimited use of the telephone, nor should he be permitted to call the governor, the mayor, the city attorney, or other like persons who could have no rational relationship to or concern with his then predicament. But, if he makes a request to call his home, his doctor, a friend, or his attorney and is afforded reasonable access to a telephone, *e.g.*, a dial telephone, for such purpose, then his immediate physical capabilities, and his coherence and intelligibility would either serve to ultimately assist him or condemn him. In either event his constitutional rights would be unimpaired.

The majority's disposition in this matter, however, does not turn upon the bare denial of an accused person's constitutional and statutory right to telephonically communicate with his attorney. The majority's conclusion that the charges in this case, and similar cases of this type, *must be dismissed* turns, rather, upon a quasi-factual determination that any such denial *invariably and irreparably prejudices* the accused person's defense. As indicated, it is with this phase of the majority opinion that I disagree.

Traditionally, and today in those geographic areas of the world where blood or chemical tests are not readily available, determination of the issue of intoxication in this type of a case has revolved about the testimony of persons who have dealt with or have heard, observed, or smelt the accused at or before the time of arrest. This type of evidence,

while not as scientifically pure as a blood or chemical test, is nevertheless predicated upon the common experience of mankind and his association with and observation of the effect of alcohol. In this light, it has been considered and evaluated over the years by judges and juries alike and given its appropriate weight in a determination of guilt or innocence. Parenthetically, it might well be observed that such testimony, accompanied in appropriate instances with the opinions and conclusions of the witnesses, has long been utilized to convict or acquit persons charged with far more serious offenses than public intoxication or drunken driving.

Frequently, too, the prosecution's eyewitness' testimony finds support in "two beer" admissions (made by an accused before he could be charged and advised of his constitutional rights), or in the presence at the scene of the arrest of physical evidence relevant to the issue of crapulence. On the other hand, it is not novel to find the accused's version of events supported by the testimony of friends, acquaintances, or bystanders who had occasion to observe him prior to arrest, or by medical or dental charts, records or testimony bearing upon the accused's alleged debilitation.

The advent of scientific tests for the detection of alcohol in the human blood stream has by no means invalidated or rendered worthless these traditional modes of proof. Neither, does it seem to me, should every failure to accord one accused of intoxication a speculative opportunity to obtain a blood-alcohol test eradicate all other evidence of intoxication and render law enforcement impotent. Society, as well as the individual, is entitled to due process of law. Particularly would this seem to be so when one considers the fact that in the year of 1964 there were some 47,700 deaths in the nation attributable to automobile accidents, with drinking a factor in as many as half of the fatal occurrences.[6]

In the instant case, the observations of the investigating officers at the scene of the accident, coupled with the defendant's "three beer" admission, were sufficient to warrant

[6]Accident Facts (1965 ed.), National Safety Council, pp. 40, 52.

defendant's arrest. The physical co-ordination tests administered with defendant's consent at the police station confirmed the officers' evaluation. When the defendant, proclaiming his sobriety and acting upon the advice of his attorney, refused to take the proffered Harger sobriety test, he not only deprived himself of any scientific evidence such a test would provide, but he also compelled the police to rely upon the evidence then in their possession in determining whether to prefer charges. Denial of defendant's right to further communicate with his attorney under such circumstances, while improper, did not eliminate or destroy the validity of the officers' observations at the scene of the accident or the results of the physical co-ordination tests.

Neither did it deprive defendant of the opportunity of gathering and presenting the testimony of persons who had observed him (a) during the course of the day, (b) during his sojourn in the different taverns prior to the accident, or (c) during his presence at the scene of the accident. Likewise, defendant was not precluded from corroborating by medical testimony his complaint of ulcers and the effect of alcohol thereon as the same related to coherency, equilibrium, or driving capacity.

Defendant, however, did not gather any such corroborative evidence. Instead, he contented himself with presenting his own uncorroborated testimony and standing upon his motion to dismiss, predicated, as it is, upon the speculative prospect that his attorney could have, between the hours of 11:30 p.m. and 4 a.m. induced a doctor, a laboratory technician, or a hospital attendant to come to the police station and procure a blood sample for analysis, and that such analysis, if made, would have been significantly more revealing than the rejected Harger sobriety test.

Confronted with this situation, the trial court, after observing and hearing the defendant testify as to the events surrounding his arrest, incarceration, and requests, in substance found that the defendant, at the time of the accident and upon his arrival at the police station, was in fact intoxicated, that a realistic, practical, and substantial question existed as the availability of a blood-alcohol test at the time

and under the circumstances prevailing, and that his detention without permission to communicate with his attorney for the period of time involved did not irreparably prejudice his defense.

A review of the record satisfies me that the trial court gave full, fair, and impartial consideration to the defendant's evidence and contentions, and that the denial of communication under the circumstances here present does not justify or compel a dismissal of the charges. Balancing the rights of due process of law between the defendant and society, it seems to me that the denial of communication here involved would warrant at most no greater a remedy than suppression of the evidence accumulated by the police at the police station. Defendant did not, however, ask this.

I would accordingly affirm the judgment.

FINLEY and OTT, JJ., concur with HAMILTON, J.