[No. 38978.    En Banc.    December 21, 1967.]

THE CITY OF SEATTLE, *Respondent*, v. WAYNE J. HILL, *Appellant.**

*Reported in 435 P.2d 692.

*Luvern V. Rieke, Wettrick, Toulouse, Lirhus & Hove, Arnold J. Barer*, and *Michael H. Rosen*, for appellant.

*A. L. Newbould* and *J. Roger Nowell*, for respondent.

*Peter Barton Hutt, Richard A. Merrill, Covington & Burling, James A. Holman*, and *Elliott, Lee, Carney, Thomas & Smart*, amici curiae.

HALE, J.—Is chronic addictive alcoholism a disease? Is it a disease that relieves one of liability under the criminal laws prohibiting drunkenness and disorderly conduct in public? Are city ordinances which forbid public drunkenness, and disorderly conduct induced by drunkenness, unconstitutional when applied to chronic addictive alcoholics? This case began with one of the two million arrests for public intoxication made annually in this country. See President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime* (1967), at 233.

Arrested and convicted of unlawful public drunkenness in Seattle Municipal Court and sentenced to 180 days in jail, the defendant appealed to and was tried de novo by the superior court sitting without a jury. Urging that he was helpless to avoid violating the ordinance because of his addiction to alcohol, he now appeals his superior court conviction.

It was close to midnight, May 4, 1966, when a citizen, accosting Patrolman Robert F. Wegner as he walked his beat, told him that a man was down. Hurrying to the 500 block on Virginia Street, the two men saw the defendant lying sprawled on his side with the lower half of his body across a public sidewalk and his head and shoulders on a wooden porch adjacent to it. Officer Wegner tried to arouse the defendant, describing the event in his testimony as follows:

A. He couldn't be aroused. I spoke to him first and told him to get on his feet and he couldn't be roused so we had to shake him and after shaking him three or four times he finally opened his eyes. Q. Did you smell any unusual odor about him? A. There was a very strong odor of liquor on him. Q. Was he able to stand and walk

normally? A. I asked the man to stand up. He tried and couldn't stand up. So my partner and I assisted him and held him up. Q. In your opinion Mr. Hill then was under the influence of alcohol? A. Yes, he was. Q. And he was under the influence to such an extent that he could not walk unassisted? A. That's right. Q. Did you have any conversation with Mr. Hill? Did you ask him anything? A. I asked him what he had been drinking. He said wine and beer. Q. Did he ask you anything? A. I asked him where he lived. He said he figured seven or eight blocks away. Q. Did he ask you to take him home? A. He said, yes, "Take me home." Q. What did you say to that? A. I said if he couldn't make it home by himself, which he couldn't do because he couldn't walk, that I would have to put him in jail. Q. And so then you did? A. Yes, we took him to the call box on the corner, rang for the wagon, and the wagon crew took him to jail.

Mr. Hill, the defendant was semiconscious when first seen by the policeman and his citizen assistant. Aside from being drunk, semicomatose and lying across a public sidewalk at a late and unusual hour, the defendant was not disorderly; neither was he noisy, boisterous, belligerent nor profane; he was not assaultive or promoting a commotion.

Charged under Seattle ordinance No. 16046, § 1, Seattle City Code 12.11.020, which reads:

It shall be unlawful for any person to be guilty of fighting, drunkenness or of riotous or disorderly conduct, or of any conduct tending to disturb the public peace, or to use any profane or abusive language, or to engage in any act or practice whereby the peace or quiet of the city may be disturbed, or to use any obscene language or be guilty of any indecent or immoral act, practice or conduct tending to debauch the public morals.

the defendant appeals his conviction on the ground that he is a chronic addictive alcoholic; that he is thus suffering from a disease which, he says, renders him "powerless to avoid violating the ordinance"; that he was convicted not of an offense but rather of suffering from a condition or being of a status; that his conviction of drunkenness violates Const. art. 1, § 14, forbidding cruel punishments, and the eighth amendment to the United States Constitution, made

applicable to the states through the fourteenth amendment; and that, under Const. art. 1 § 3, and the fifth amendment to the United States Constitution, the ordinance under which defendant was convicted and sentenced is an unreasonable exercise of the police power and deprived the defendant of his liberty without due process of law. The challenged ordinance has been on the books since 1907, and under it hundreds of thousands of arrests have been made and convictions entered.

In asserting the hopelessness of his predicament, and the inevitability of its consequences, defendant showed that he had been convicted of drunkenness 98 times; that his total sentences ran to 17½ years although he had served only a fraction of this, being repeatedly let out of jail on suspended sentences. He refers to himself as a "chronic drunk" and dates his serious drinking problems from 1946 when his wife divorced him. At age 62, in addition to his 98 convictions for public drunkenness, he has been twice convicted of escaping while a jail trusty. The accumulated unserved time from these convictions amounts to about 5 years, but there appears to be no proceedings pending or threatened to make him serve any part of this.

There is little doubt that defendant shows a fairly typical case history of an alcoholic. But he shows too that he possesses substantial volitional control over his actions and whether he will be found drunk in public. He testified that in 1963 he entered Firland Sanatorium for the treatment of tuberculosis and during an 18 months' stay there drank no intoxicants. Despite 20 arrests for public drunkenness after leaving the sanatorium, he expressed the opinion on cross-examination that, if he could go 4 years without a drink, he could be cured—but would give no estimate as to the minimal time needed.

Dr. Edward M. Pattison, eminently qualified specialist in psychiatry and the treatment of alcoholism, while emphasizing the inability of an alcoholic to stop drinking once he had started, said that persons so afflicted typically remained sober for periods of 6 to 8 months voluntarily but

eventually return to their drinking. Asked why the defendant drank, the doctor said:

> One, the chronic addictive alcoholic finds solace and comfort in drinking. There is a certain degree of escape from feelings of guilt and feelings of shame and feelings of loneliness which he finds in drinking which he does not find from normal social relations that you might say the average person would find.

He said, too, that the element of guilt figured largely in the inducement, that guilt

> is a common hallmark of all chronic addictive alcoholics, severe feelings of guilt and shame which can only be overcome by taking more alcohol so that one does not experience these feelings.
>
> This creates a cycle, drinking, feeling guilty and shameful about drinking, returning to drinking, again those excessive feelings of guilt and shame, so it sets up a perpetual cycle.

Dr. John H. Lindberg, a specialist in internal medicine, testified that he gave Mr. Hill a physical examination and found no physical evidence of alcoholism, but readily diagnosed him as a chronic addictive alcoholic from his medical history. He said that Mr. Hill, considering his frequent drunkenness over so long a time, showed very little deterioration of the brain cells—a surprising lack of an expected consequence. Dr. Lindberg testified that alcoholism, unrelieved and untreated, produces cirrhosis of the liver, *i.e.*, destruction of liver cells and their replacement by scar tissue, and that this inevitably causes death.

If uninterrupted drunkenness is a direct cause of death, then undeniably frequent periods of confinement in a clean city jail with nourishing food during 20 years of chronic addictive alcoholism, were of beneficial therapeutic effect. Defendant's medical history contributes to the idea that laws against public drunkenness are designed to protect not only society but the offender too. Although we would not recommend jail confinement as a suitable substitute for medical, psychiatric and social therapy in the treatment of alcoholism, we observe that, in the absence of any other

available alternatives, the afflicted person derives considerable benefit and protection from it. So did Mr. Hill.

Undoubtedly a beneficial therapy must have intervened to keep the defendant in so good a physical condition that, after 20 years of chronic addictive alcoholism, his doctor could find no physical symptoms of the sickness and had to rely exclusively on a case history to confirm the diagnosis of chronic addictive alcoholism. It thus seems reasonable to conclude that Mr. Hill's frequent periods of confinement in jail, following his bouts of drunkenness, were to a large degree responsible for his continuing physical health.

Dr. Lindberg said that Mr. Hill had potentials "whereby he may be able to refrain from drinking but there has been no demonstration of this up until this time." He said, however, that, even without any outside assistance whatever, there was a 5 per cent chance of successful self-treatment and that developing the will to self-rehabilitation was an important aspect in any treatment of alcoholism. As a physician specializing in internal medicine, with extensive practice in treating alcoholism, he emphasized that the will to recover was very important in achieving success.

Finally, from the testimony of Judge Charles Z. Smith, then of the Seattle Municipal Court and now of the superior court, we note that a very high percentage of persons in King County afflicted with chronic addictive alcoholism are never arrested for drunkenness in public. Judge Smith, applying what is known as the Jellinek formula for ascertaining the degree of alcoholism in a particular person, to statistical data for Seattle and King County, estimated that, of approximately 37,000 alcoholics in King County, 27,000 of them live in Seattle; that, during 1965, about 3,600 individuals accounted for 11,534 convictions of public drunkenness in the Seattle Municipal Court. Judge Smith expressed the opinion that some 23,400 alcoholics in Seattle manage to escape court appearances by posting and forfeiting bail, or drinking where they are not subject to view by the police. On cross-examination, he estimated that 90 per cent managed to escape court appearances on charges of public in-

toxication. He felt that 99 per cent of the persons actually appearing in Municipal Court on charges of drunkenness were residents of the city's slums and came from among the lowest income group of the city.

Testifying that, although the initial contact by police with alcoholics in Seattle leads to arrest and confinement, Judge Smith said there are medical personnel and facilities attached to the jail. The city court maintains an orientation and rehabilitation school where physicians and representatives from Alcoholics Anonymous give lectures and hold discussions pointing out the dangers of alcohol to alcoholics and make an effort to rehabilitate them. Attendance at these sessions averages about 70 persons a week, with 110 persons present during the period of greatest attendance.

He described a number of institutions developed for the attempted rehabilitation of alcoholics. These institutions include those of a purely private nature where a course of treatment may cost the patient nearly $1,000, and a number of charitable institutions charging nominal or no fees at all. Among the latter are the Pioneer Fellowship House for Men, the Louie Martin Home and the Yesler Rehabilitation Center. These organizations charging only about $20 per week are, nevertheless, beyond the financial reach of thousands of alcoholics. Such organizations draw some financial support from the State Department of Health, but can handle only about 159 alcoholics at any one time. Judge Smith recommended that rehabilitative institutions operated at public expense be substituted for the city jail, and include facilities called "detoxification centers."

Alcoholism is a terrible thing. However it may be classified legally, whether as a sickness, a condition of psychological dependency, or a disease entity, its victims should be treated with compassion. Nearly every adult person knows of some alcoholic who, through the ravages of this affliction, has lost his family, his job, and ruined his career, and who has suffered a marked physical disability and even death from alcoholism. Among its consequences too are the pain and suffering, the humiliation and deprivation inflicted

upon his family; and not to be overlooked is the fact that alcoholics have been known to commit serious crimes.

We agree with the defendant, his counsel and witnesses that the establishment of "detoxification centers" run under medical supervision, along with clinics giving medical, psychiatric and social therapies, provide practical and humane alternatives for the treatment of chronic alcoholism in place of the city jail, but that does not solve the problem before us. Our problem is whether the absence of such facilities makes the city laws against public drunkenness unconstitutional as to chronic addictive alcoholics.

Courts recognize the existence of alternatives to jail sentences in dealing with alcoholism. Whether the alternatives are more practical or less practical, more effective or less so in rehabilitating chronic addictive alcoholics, however, does not, we think, present the determinative criteria as to whether the Seattle ordinance under which the defendant was arrested and convicted is unconstitutional.

Defendant, as one of an endless line of alcoholics brought before the city court and thence to jail and from there possibly to one of the rehabilitative facilities, does not establish that his treatment at the hands of the law falls within the eighth amendment to the United States Constitution as cruel and inhuman punishment. He acknowledged that drinking "is kind of a pastime and a habit"; that he did not feel compelled to drink; that for 18 months while in the tuberculosis sanatorium he had not had a drop of liquor and that he knew it was unlawful to appear drunk in public. His evidence showed that he was but one of perhaps 37,000 alcoholics in King County, 90 per cent of whom manage to avoid court appearances or even arrests.

If he is being punished at all, it seems to be largely self-punishment. Defendant, however, says that the law punished him for conduct that he could not control or avoid; that being incapable of avoiding or violating the laws, his affliction, he says, is the legal equivalent of insanity so that laws forbidding public drunkenness cannot constitutionally prohibit conduct which he cannot avoid.

Defendant's proof, however, is incompatible with his asserted helplessness. He established prima facie that 90 per cent of the chronically addictive alcoholics in Seattle manage to avoid the public eye when drunk and thus avoid conviction. If 90 per cent of a class can do so, the courts cannot categorically exonerate of culpability the remaining 10 per cent of the same class. His evidence contradicts his contention that actus reus, requiring volition, and mens rea, requiring an evil intent, are lacking in his case. See R. Perkins, Criminal Law 652-55 (1957).

■ Assuming, arguendo, that the defendant may not have possessed the will to avoid drinking to the point of intoxication, his conduct was not so involuntary as to compel him to become drunk in public. Moreover, his drunkenness was an offense malum prohibitum, requiring no mens rea or evil design for conviction. If he possessed the capability of avoiding public drunkenness, the other basic component, that of actus reus, the volitional conduct, was thus present. *State v. Lindberg,* 125 Wash. 51, 215 Pac. 41 (1923). Defendant did not show that anyone forced the liquor upon him, or practiced a fraud by making him believe that the beverage taken was not an intoxicant. Both his drinking and being found drunk in public appear volitional on his part under the law. That he was a chronic addictive alcoholic did not make it inevitable that he be found drunk or sprawled across a public sidewalk late at night.

Relying largely upon the rationale of *Robinson v. California,* 370 U. S. 660, 8 L. Ed. 2d 758, 82 Sup. Ct. 1417 (1962), defendant again urges that, being a chronic addictive alcoholic, he is being punished for having a disease or being of a status instead of for committing an offense. We think that the answer to this contention is short and clear. In that case, the State of California, by statute, had made narcotics addiction alone, that is the status of being an addict, punishable as a public offense. In striking down a conviction based on proof of addiction only as constituting cruel and unusual punishment under the Eighth Amendment—made

applicable to the state by the Fourteenth Amendment—the Supreme Court sharply delineated the distinction between simply being a narcotic addict and the actions expected of an addict. Holding that, although a state may not punish a mere status or make a criminal offense of what is considered medically to be a disease, the court affirmed the longstanding principle that a state may forbid and punish the conduct ordinarily related to an addiction such as the possession, purchase, sale, or the condition of being under the influence of narcotics. *Minnesota ex rel. Whipple v. Martinson,* 256 U. S. 41, 65 L. Ed. 819, 41 Sup. Ct. 425 (1921). It is the conduct or actions, not the status or disease, that becomes punishable.

In the instant case, it was Mr. Hill's conduct, his actions in public while drunk, which caused his arrest and confinement, not his status or condition of being an alcoholic. Thus, when Patrolman Wegner observed Hill sprawled across the sidewalk in a drunken stupor late at night, regardless of any compassion he may have felt for the defendant as an identifiable alcoholic and skid row derelict, he properly arrested Hill for what he was doing and not for what he was.

The officer made the arrest under Seattle ordinance No. 16046, § 1, which does not purport to make an offense of being an alcoholic, but rather to preserve the public peace and welfare by prohibiting public drunkenness. Although lying in a stupor on a sidewalk may well be an indication of alcoholism, it is evidence of drunkenness in a public place, much the same as loud, boisterous, profane or belligerent conduct, likewise prohibited in the ordinance, may also indicate drunkenness in public. Behavior is what counts; the ordinance regulates behavior only. We see no reason under the constitutions of the state and the United States why the communities of this state may not adopt and enforce legislation to protect themselves from the nuisance, offensive misconduct, and serious dangers at times associated with public drunkenness.

Looking now from a different angle at defendant's claim that his conduct was involuntary and unintentional and, therefore, not criminally culpable, we think it to be well-established law that

> Drunkenness is not to be regarded as involuntary . . . merely because it is the result of an inordinate and irresistable appetite for drink, overcoming the will and amounting to a disease. Clark and Marshall, Crimes § 6.10 (6th ed., M. Wingersky 1958).

■ Drunkenness in public falls within that category of offenses defined to preserve the public peace, health, welfare and morals and protect the citizenry from affront, nuisance and danger. Like many other forms of public disorder, intent is not an element and, therefore, need not be proved. Once the acts constituting the offense have been proved beyond a reasonable doubt, the offense has been established and a judgment of guilty may thereupon enter. This rule is true of nearly all crimes malum prohibitum.[1] Referring to "public welfare offenses" such as public intoxication, the Supreme Court in *Morissette v. United States,* 342 U. S. 246, 256, 96 L. Ed. 288, 72 Sup. Ct. 240 (1952), said:

> [L]egislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. . . . [C]ourts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.

Consequently, since intent is not an element of the offense, it need not be proved to establish drunkenness in public.

---

[1]There is a distinction between volition and intent. In the case of public drunkenness, while it would be no defense to show that the defendant had formed no mental purpose to sprawl on the sidewalk in a drunken stupor, he would, nevertheless, possibly have a defense had he shown that he became intoxicated within the quiet confines of his home and abductors carried him therefrom by force and left him upon the sidewalk helplessly drunk.

■ Laws forbidding drunkenness in public bear a manifest relationship reasonably connected to the public peace, health, safety, morals and welfare and thus fall within the city's police power to enact and enforce them. *Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964); *Ragan v. Seattle,* 58 Wn.2d 779, 364 P.2d 916 (1961); *Campbell v. State,* 12 Wn.2d 459, 122 P.2d 458 (1942); *Minnesota ex rel. Whipple v. Martinson,* 256 U. S. 41, 65 L. Ed. 819, 41 Sup. Ct. 425 (1921). Bearing thus a rational relationshp to the ends sought to be attained, laws against public disorder and disorderly conduct fall within the legitimate exercise of the police power and do not violate the fifth amendment to the United States Constitution or Const. art. 1, § 3.

Since the defendant appreciated the nature and consequences of his violation, and received a fair trial, we do not see how the conviction deprived him of property or liberty without due process of law or denied him the equal protection of the laws under the Fifth Amendment.

■ This state is committed to the rule that every sane person is responsible for his voluntary acts. *State v. Mays,* 65 Wn.2d 58, 395 P.2d 758 (1964). If one is capable of distinguishing between right and wrong and knows the nature and moral quality of his actions, he is deemed sane under the M'Naughten rule, a doctrine adhered to by this and the great majority of courts. *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962), *cert. denied,* 375 U. S. 883, 11 L. Ed. 2d 113, 84 Sup. Ct. 154 (1963); *Leland v. Oregon,* 343 U. S. 790, 96 L. Ed. 1302, 72 Sup. Ct. 1002 (1952), 45 A.L.R.2d 1447. If we were to condition this rule by relieving chronic alcoholics of responsibility for their public misconduct while drunk, we would inevitably, under the same reasoning, be forced to relieve them of the legal consequences of other crimes committed while under the influence of voluntarily consumed intoxicants.

Although the defendant says he was under a compulsion to drink, there is no proof, nor is it to be inferred, that anyone forced the liquor upon him. Despite his claimed addiction, he had the power to make a choice. When one

chooses to drink, he must in law be deemed to have voluntarily invited the consequences of that drinking. 8 A.L.R. 3d 1236.

▉ Only in a limited way may voluntary intoxication be deemed to affect the degree of criminal culpability. In a statute expressly declaring that voluntary intoxication does not reduce the criminality of one's conduct, the fact of intoxication may be considered if intent or motive are elements of the crime charged. RCW 9.01.114 sets forth the policy of this state concerning intoxication as a defense to a crime:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his intoxication may be taken into consideration in determining such purpose, motive or intent.

We applied the foregoing statute in *State v. Shelton*, 71 Wn. 2d 838, 431 P.2d 201 (1967), but refused to exonerate the defendant of criminal liability where, on being tried for assault in the first degree for shooting and seriously wounding a person, the defendant sought to prove that he could not be held liable for his conduct because he had been drinking heavily for several days.

Accordingly, in our view, chronic addiction to alcohol is not the legal equivalent of insanity. When the alcoholic violates the criminal code, except for RCW 9.01.114 allowing him to show intoxication only as a factor to be considered by the jury in weighing the questions of intent or motive, the alcoholic is held to the same standards of responsibility as everyone else. Just as voluntary intoxication does not serve to exonerate one of murder, assault, larceny, burglary or other serious crimes, it does not relieve one of the consequences of the offense of being drunk in public. Although it may be regarded as a disease entity for medical purposes, chronic addictive alcoholism is not

such a disease that renders its victims immune from prosecution for public drunkenness.

Finally, we consider defendant's contention that, if, as a matter of policy, this court will prevent the arrest and imprisonment for public drunkenness of persons suffering from chronic addictive alcoholism, it will compel society to substitute a more humane and enlightened form of treatment and induce rehabilitative measures in place of confinement in the city jail. Citing *Driver v. Hinnant,* 356 F.2d 761 (4th Cir. 1966), which held that a chronic alcoholic cannot be convicted of public intoxication since his "drunken public display" was involuntary because of his disease, defendant urges that we take a similar view. That case, treating the defendant's drunken behavior as not the act of the defendant but likening it to the "movements of an imbecile or a person in a delirium of a fever," overturned a conviction for drunkenness in public as a cruel and unusual punishment violative of the Eighth Amendment.

Defendant also cites *Easter v. District of Columbia,* 361 F.2d 50 (D. C. Cir. 1966), for the idea that chronic alcoholism was ipso facto a complete defense to the charge of public drunkenness. But that ruling appears based on a "Rehabilitation of Alcoholics" statute, 61 Stat. 744, ch. 472, D. C. Code § 24-501, enacted to provide for commitment to and treatment in alcoholic clinics in the District of Columbia. There a statute defined alcoholism within the District of Columbia as a disease, and authorized the courts of the district to commit alcoholics to clinics established by the statute. Thus, the basic holding in *Easter* supports the proposition that the state legislatures may enact similar legislation and establish similar procedures and clinics under the police power, but sheds very little light on the constitutional problem at hand. An integral part of the rationale supporting the decision is that, in providing for a medical commitment as a substitute for jail confinement, the state, by statute, precludes the courts from "attaching criminality

in this jurisdiction [D. C.] to intoxication in public of a chronic alcoholic."

Although defendant's proof in the instant cause refutes his contention that he could not avoid transgressing the law, and that he was helpless to prevent himself from falling into a drunken stupor on the sidewalk, we believe his policy arguments to be equally unpersuasive. First, we have no information whether in blocking arrests for drunkenness in public the courts in *Driver v. Hinnant, supra,* and *Easter v. District of Columbia, supra,* have compelled the establishment of a markedly improved procedure for curtailing public drunkenness and treatment of alcoholism. Have those decisions effected any changes in the incidence of alcoholism in the District of Columbia and throughout the Fourth Circuit? It may be the decisions, instead of reducing alcoholism by ordering medical treatment, simply deprive society and the alcoholic of what limited therapy is now available by means of jail confinement, leaving more or less of a vacuum in the handling of intoxicated persons. Indeed, *Easter v. District of Columbia, supra,* describes the futility of the situation where, after observing that the statute defining and authorizing medical treatment for alcoholics, has been on the books for nearly 20 years, it says, at 53:

> We find no basis for judicial repudiation of the Act of 1947. *The fact that in the intervening years the facilities contemplated by the Act have not been made available does not detract from the legal effect of those provisions of the Act which define the nature of the sickness* [alcoholism]. (Italics ours.)

We cannot determine whether the care and treatment of alcoholics in the nation's capitol and in the communities of the Fourth Circuit is now better than in Seattle, or whether those communities have shown a marked decrease either in alcoholism or criminality arising from alcoholism which may in any way be reasonably attributed to judicial decision.

The policy argument poses another question. Is it proper for the courts to try to compel the adoption of

legislation and the expenditure of public funds for the attainment of seemingly desirable ends by refusing to uphold existing legislation? Is this a legitimate use of the judicial power? We think not. The instant case demonstrates the soundness of the rule that courts are not concerned with the wisdom of a statute but only with its meaning and validity. That the judges can think of a better way to attack society's ills than the methods adopted by the executive and legislative branches of government gives them no license to employ the judicial power in forcing their views upon society. *State ex rel. Bolen v. Seattle,* 61 Wn.2d 196, 377 P.2d 454 (1963).

Obviously, the courts ought not invalidate legislation simply in the hope of compelling better legislation. Suppose this court, as a matter of public policy, were to strike down Seattle's ordinance prohibiting public drunkenness. What, then, are the alternatives? The courts levy no taxes, appropriate no moneys, employ no doctors, nurses, social workers and attendants, operate no hospitals, clinics, detoxification centers, and have no personnel or facilities under their direction for the care and treatment of chronic addictive alcoholics or for the protection of society from their misbehavior. Having created the vacuum, the courts are without means to refill it.

And what of the alcoholic himself? Is the Seattle ordinance against public drunkenness completely insensitive to him? Defendant's frequent periods of internment in the city jail, away from liquor and with nourishing food, undoubtedly have done much to keep him alive and in good physical health. Better a clean warm jail on a rainy, winter night than a miserable wet gutter. His arguments that there are better ways to handle alcoholics than methods now employed by the city are undoubtedly sound, but should be addressed to the legislative and executive branches of government where the money is raised, appropriated and allocated, personnel engaged and facilities established to carry out the rehabilitative policies.

Grave as are the consequences of alcoholism, and distressing as the affliction may be, there is in it some great area for self-cure and self-treatment. Where an alcoholic may refuse to drink, or, by exercise of will, arrest his sickness, persons suffering from cancer, tuberculosis, arthritis, multiple sclerosis, insanity, mental retardation and a host of other diseases and incapacities have no such option. *Robinson v. California*, 370 U. S. 660, 8 L. Ed. 2d 758, 82 Sup. Ct. 1417 (1962). To the people, through their elected representatives, then, must be left the decision as to the amount of taxes to be raised and the share of the public purse to be spent on the care of alcoholics, and what amounts of money and talent shall be devoted to other governmental enterprises affecting the public safety, health, welfare and morals. Courts ought not determine by decree what is left by the constitution exclusively to the decision of the legislative and executive branches of government.

It is thus for the legislative and executive branches of government to decide how much money, talent and physical facilities will be allocated to the treatment of alcoholism and how much to the alleviation of pain and misery and suffering elsewhere. The constitution in placing these powers of decision there wisely kept from the courts any duty or power to determine such questions. The Seattle city ordinance against public drunkenness, in our opinion, therefore, is a constitutional exercise of the police power applicable to chronic addictive alcoholics.

Affirmed.

DONWORTH and HUNTER, JJ., concur.

WEAVER, J., concurs in the result.

HILL, J. (concurring in the result)—I disagree with much that is said in the majority opinion; however, I agree with the result reached—that the laws with which we are concerned are constitutional and should be enforced until the legislative bodies of the city and state devise a more humane and effective way of dealing with the particular offense. As a

court, we are no more entitled to refuse to enforce the legislation here involved than we are to refuse to uphold the death penalty because we might personally believe it to be barbarous and ineffective.

On the other hand, I agree with much that is said in the dissent, particularly with that portion which points out that the criminal-law approach to chronic addictive alcoholism, as manifested by public drunkenness, is a total and costly failure. However, our polemics should be directed to the legislative bodies rather than at the majority opinion. The majority, like the Seattle police in this case, is doing the best it can with what it has.

The dissent's concession of 27,000-37,000 addictive alcoholics in the Seattle-King County area prompts me to two or three additional observations. While the dissent points out the pitiable condition of these unfortunates, we should not lose sight of the fact, generally overlooked, that the cause of alcoholism is alcohol; and we should also be deeply concerned about the number of men, women and children killed and injured annually on our highways by the drunken and the drinking drivers. Most of these are not included in the addictive alcoholics; they just had a few drinks too many at that particular time.

Under ordinary circumstances, we would ban the sale of any product which could produce an illness of the type described by the dissent in 27,000-37,000 people in one city or county in our state. These, of course, are no ordinary circumstances, and I understand fully that we are not about to ban or limit sales, regardless of how many lives may be wrecked or traffic accidents caused. Indeed, as a state, we are endeavoring to increase such sales. However, it would seem that we should at least take adequate care of the increasing number of alcoholics, addictive or preaddictive—rehabilitating where possible and ameliorating where rehabilitation is impossible. The staggering cost[1] of such care should be borne by the business which makes it necessary.

---

[1]No pun intended.

Were we to pour our boasted "profits" from the state's participation in the business into meeting the social consequences[2] and the costs thereof, we would find the "profits" entirely illusory. I join with the dissent in its desire for a better and more humane solution of the problem; but I would not jettison the only procedures that we have.

FINLEY, C. J. (dissenting)—Some while ago, in *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897), Mr. Justice Holmes commented:

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It *is still more revolting if the grounds upon which it was* laid down have vanished long since, and the rule simply persists from blind imitation of the past.

These somewhat caustic but, curiously enough, quite reasonable and even logical observations of Holmes, J., seem to me to be relevant to the orthodox rules of our legal system designed and relied upon to regulate the activities or conduct of chronic addictive alcoholics, ostensibly for the common weal. In evaluating and disposing of the problem of the chronic addictive alcoholic, the majority opinion, in my judgment, perpetuates the same sort of legal ritualism and legalistic superficialities that prompted Justice Holmes' above, oft-cited comment.

Some of the underlying assumptions seem to be that alcoholics are not really sick but only people who are weakwilled; that if alcoholics would muster a bit of willpower and a little personal pride they could shed their decadent and socially deplorable ways and become decent, law-abiding functionaries in our society. But such assumptions are in direct and diametric opposition to the uncontroverted and unequivocal medical testimony in the instant case. Moreover, chronic addictive alcoholism involves too many people, and its overall social implications are too important, to be accorded nothing better than tired cliches

---

[2]This would include the additional policing and court costs made necessary.

from yesterday's convenient Victorian moralisms. If ever there were any social purpose for criminally punishing chronic addictive alcoholics simply for appearing in public in a drunken condition it has long since vanished; so should that way of thinking and the rules facilitating such punishment. Abraham Lincoln once said that habitual drunkenness should be "treated as a misfortune, and not as a crime, or even as a disgrace." A. Lincoln, *Charity in Temperance Reform,* in 2 Life and Works of Abraham Lincoln 73, 78 (1907). I firmly believe this great American's advice is pertinent and timely, and should be put into practice today.

The one issue before this court is whether an ordinance penalizing drunkenness in public is unconstitutional when applied to individuals afflicted with chronic addictive alcoholism. This constitutional issue involves consideration of amendments 8 and 14 to the United States Constitution, and article 1, section 14 of the Washington State Constitution. The issue does *not* raise or affect the question, contrary to what the majority suggest, whether a chronic addictive alcoholic is responsible for acts in which he engages while intoxicated. Furthermore, the issue does *not* raise or affect the question, also contrary to what the majority suggest, whether a chronic addictive alcoholic's illness should be available to him as a defense if charged with committing some crime other than being drunk in public. Although the trial judge mentioned these questions in his oral opinion, they were not properly before him and they are not raised on appeal. The *sole* issue presently before this court is whether an individual suffering from chronic addictive alcoholism can be convicted for appearing in public in a drunken condition.

## I. The Nature of Defendant's Disease

Numerous text materials exist which deal with the nature of alcoholism. Each one that I examined unequivocally concludes that alcoholism is a disease which should be treated medically rather than punished criminally. *See, e.g.,* Report by the President's Commission on Law En-

forcement and Administration of Justice, *The Challenge of Crime in a Free Society* 233 (1967); M. S. Guttmacher and H. Weihofen, Psychiatry and the Law 318 (1952); D. J. Pittman and C. Gordon, Revolving Door: A Study of the Chronic Police Case Inebriate (1958); D.A.R. Williams, *Drunkenness and the Criminal Law in New Zealand*, 2 New Zealand Univ. L. Rev. 297 (1967). Yet, society has been slow to comprehend that drinking, a pastime enjoyed by many but condemned by many others, *may be a symptom of an illness* from which thousands of individuals suffer. At least one author has concluded: "One may well believe that traditional attitudes of hostility toward drunkenness render rational and just determinations more difficult than in insanity cases." J. Hall, *Intoxication and Criminal Responsibility*, 57 Harv. L. Rev. 1045 (1944). Public attitudes being what they are, involving as they do intellectual inertia and a lack of awareness and interest in social problems, I think it is important to discuss some of the characteristics of alcoholism more fully than I believe is done by the majority.

According to the testimony of Dr. Edward M. Pattison, a highly qualified psychiatrist on the staff of the University of Washington School of Medicine who has spent much of his professional life working with alcoholics and their problems, alcoholism may be divided chronologically into three phases: prodromal, crucial or basic, and chronic. These categories were first coined by Professor E. M. Jellinek, and have since become the ones most widely accepted for analytic purposes.

A chart to which Dr. Pattison referred during his testimony, illustrating Professor Jellinek's divisions of alcoholism, indicates that in the prodromal phase, an alcoholic begins sneaking drinks and becomes preoccupied with drinking. He tends to gulp his drinks and will usually avoid any reference to drinking. His first blackout usually will occur during this phase.

By the time an alcoholic reaches the crucial or basic phase, he has the disease of alcoholic addiction. Symptoms

of alcoholic addiction include changes in drinking patterns, protection of supply, loss of jobs, and morning drinking. Somewhere between this phase and the chronic phase, an alcoholic experiences "loss of control," that is, once he begins drinking, he can no longer stop until he is intoxicated.

In the chronic phase, an alcoholic is completely addicted. He not only cannot stop once he begins drinking, but he cannot stop himself from taking a first drink. He begins to physically deteriorate and his alcohol tolerance decreases. He experiences psycho-motor inhibitions and tremors, and cirrhosis of the liver begins. If his disease goes untreated, he will die.

Dr. Pattison testified that defendant was in the prodromal phase of alcoholism from 1928 to 1946. Defendant was divorced in 1946 and his family fell apart soon afterwards. Immediately subsequent to this, defendant's drinking habits changed radically, and shortly thereafter he passed into the crucial or basic phase and then into the chronic phase of alcoholism.

Alcoholism is, in one sense, somewhat unique. While it can be arrested in most cases, it is virtually impossible to cure. According to Dr. Pattison, less than 5 per cent of all alcoholics could ever be said to be cured, *i.e.*, able to return to normal drinking. For the remainder, rehabilitation is the best that treatment can offer. Treatment helps alcoholics control their urges to drink. They may still have cravings for alcohol but it may be possible for them to stifle their cravings and perhaps lead normal lives.

The principal reason there is no cure for alcoholism lies in the addictive effect of alcohol on human beings. According to Dr. Pattison, addiction is a complex array of physical, emotional, and social needs which *compel* an addict to attempt to satisfy his cravings. Alcohol addiction manifests itself in two ways which are important to this case: (1) An addict is unable to prevent himself from drinking, and (2) once he begins to drink he is unable to stop until intoxicated.

To say defendant is unable to prevent himself from drinking is not to say that he must drink continuously. Certainly he will not drink when being restrained involuntarily, and he may even abstain voluntarily for a short while. But, this does not mean that a chronic alcoholic is not addicted to drinking. While a chronic addictive alcoholic may refrain from drinking for short intervals, he will virtually always return to it. Dr. Pattison commented upon this point as follows:

> [T]he chronic addictive alcoholic will attempt to remain sober and may do so up to six or eight months voluntarily *but at the end of this time he is unable to refrain from finally and eventually returning to drinking.* (Italics mine.)

The majority seem to believe that drinking is a voluntary thing to a chronic addictive alcoholic. Numerous places in the majority opinion stress the notion that if alcoholics were strong enough people they could shake their drinking habits. The majority evidently feel alcoholics are simply weak characters who are *unwilling* to control their alcohol problems, *even though quite able to do so.*

The only evidence presented by the majority in support of this view is testimony by Dr. John H. Lindberg, a highly qualified internist on the staff of the University of Washington School of Medicine, to the effect that there is perhaps a 5 per cent chance that defendant could successfully treat himself for his illness. However, it is likely Dr. Lindberg made this statement *only* to show that self-rehabilitation is *possible,* and not to suggest that there is any substantial probability of self-rehabilitation occurring. In other words, Dr. Lindberg's point seems to have been that while as an abstract medical proposition it is *conceivable* for chronic addictive alcoholics to prevent themselves from drinking, as a practical matter it is impossible to view their drinking as anything but involuntary in all but the rarest of cases. On cross-examination, the following colloquy took place between the prosecution and Dr. Lindberg:

> Q. I believe you said, Doctor, that Mr. Hill revealed to you some potentiality of the ability to refrain from im-

bibing? A. Yes. *In other words I would also say his case is not hopeless.* (Italics mine.)

In light of the myriad authorities to the contrary, *e.g.,* E. M. Jellinek, The Disease Concept of Alcoholism (1960); D. J. Pittman and C. Gordon, Revolving Door: A Study of the Chronic Police Case Inebriate (1958), I find the unlikely suggestion of support contained in Dr. Lindberg's statement a dangerously slim thread upon which to hang the notion that chronic addictive alcoholics are voluntary drinkers who are capable of exercising self-rehabilitation if they so desire.

A chronic addictive alcoholic, because of the social and economic disorientation which results from his disease, spends much of his time while drunk in public. Public displays of drunkenness could in fact be said to be symptomatic of chronic addictive alcoholism, in the sense that they are normal concomitants of the disease. Dr. Pattison, in response to a question on cross-examination, made the following remark:

Q. . . . [W]ould you say that *appearing in public while under the influence of alcohol* by an alcoholic is a *symptom* of alcoholism? . . . A. I will say *yes in that this is typical of the chronic addictive alcoholic.* You do not find the early prodromal excessive drinker appearing intoxicated in public. This would be unusual. It is only when the person has entered into vocational and social deterioration and disintegration *and no longer can control the drinking behavior* that he appears in public intoxicated *so I would say by and large, yes.* (Italics mine.)

As a consequence, we can only conclude, on the basis of Dr. Pattison's uncontested statement, that the ordinance with which we are concerned in the instant matter punishes a particular class of individuals solely for exhibiting symptoms of a disease from which they suffer which they characteristically cannot prevent exhibiting.

The majority, however, evidently do not share this view. One of the points emphasized is that an inebriate, even an alcoholic, *need* not appear intoxicated in public. In support

of this position, the majority refer to certain statistics cited by King County Superior Court Judge Charles Z. Smith (a defense witness in the instant case). According to Judge Smith, there are about 37,000 alcoholics in the King County area, of which approximately 10 per cent are tried for public intoxication each year. The majority opinion concludes that if 90 per cent of King County's alcoholics can avoid public exhibitions of drunkenness, it is not unreasonable to require the remaining 10 per cent to do likewise.

There are three reasons why I cannot agree with this conclusion. First, the figure of 3,600 people arrested for public intoxication includes only those individuals who appear for trial. According to Judge Smith, the municipal court in Seattle has a policy of allowing those able to post the $20 bail to forfeit their bail and avoid appearing in court. Consequently, only those arrested who cannot raise $20 ever have their cases processed. It is for this reason that Judge Smith estimates that "at least 99 per cent" of the 3,600 individuals processed are "skid road" alcoholics, individuals least likely to have the means to remain off the streets.

Second, arrest policies of most police departments are such that only individuals who seem to be broke, and to have no where to go and no one to help them, are arrested for public drunkenness, unless their drunkenness is accompanied by some misconduct. See Report of the President's Commission on Crime in the District of Columbia 474, 475 (1966). I am convinced that these arrest policies, which no doubt may be justifiable under the circumstances, further dull the force of arguments emphasizing a discrepancy between the total number of alcoholics and the number of inebriates processed in municipal courts.

Third, the figure cited by Judge Smith of 37,000 alcoholics in the King County area (27,000 alcoholics in the Seattle area alone) does not reflect the phase of alcoholism each is in. On cross-examination, Dr. Pattison was careful to point out that the figures cited fail to distinguish chronic addictive alcoholics, those who characteristically are found

drunk in public, from crucial or basic and prodromal phase alcoholics. "What we define as the chronic addictive alcoholic," stated Dr. Pattison, "probably only represents a small percentage of the 27,000 or 37,000 alcoholics in this area." In light of these reasons, I cannot see how the fact that only 10 per cent of King County's *entire population* of alcoholics are processed through municipal court each year in any way detracts from Dr. Pattison's statement that public drunkenness is a symptom of *chronic addictive* alcoholism.

Thus, contrary to the views of the majority, it seems sound and convincing to me to conclude that chronic addictive alcoholism is a disease, that its symptoms include the inability to refrain from drinking, the inability to stop drinking once started until intoxicated, and a frequent display of public drunkenness, and that while it is unlikely that an individual having this illness can be cured, it is quite likely that proper medical aid can do much to rehabilitate him. The more pertinent question, however, is whether it is unconstitutional to prosecute chronic addictive alcoholics for public drunkenness. The majority say no; I disagree.

## II. Defendant's Conviction as Cruel and Unusual Punishment

Initially, it should be said that there are no serious suggestions by responsible, thinking people that chronic addictive alcoholics *ought to be* punished criminally. The consensus seems to be that the criminal law approach to chronic addictive alcoholism and its related social problems is a miserable and abject failure. The continued existence of this problem and our lack of answers should be an ever-present reminder of what can only be termed a national disgrace. *See* Report by the President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* 233, 235 (1967); Report of the President's Commission on Crime in the District of Columbia 474, 490, 501 (1966); J. Murtagh, *The Derelicts*

*of Skid Row,* Atlantic Monthly, March 1962, pp. 77, 81. On a KING radio documentary entitled "Cycle of Shame," broadcast on January 17, 1967, Seattle Police Chief Frank Ramon expressed views which are typical among individuals who are aware of the senselessness of current criminal law policies with regard to alcoholism:

> Certainly I'd like to see a determination that these people [alcoholics] who are living useless futile lives, and certainly it's not because they want to, that they are not treated like criminals. I believe that, some 200 years ago, mentally ill persons were treated in the same fashion, and I think it is time our society grows up and recognizes that there are problems beyond an individual's control that though his behavior may be anti-social, he should not be treated as a common criminal.

The enormous expense and time consumed by, and the burden imposed upon, our overcrowded lower courts in prosecuting alcoholics for public drunkenness are additional factors which should cause disenchantment with our present criminal law approach. *Approximately one-third of all reported arrests in the United States are for public intoxication.* President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Courts* 99 (1967). In 1963, this amounted to 1,514,680 arrests. E. Barrett, *Criminal Justice: The Problem of Mass Production,* in The American Assembly, Columbia University, The Courts, the Public, and the Law Explosion 85, 103 (1965). Recidivism is the rule rather than the exception among those arrested for public drunkenness. In the instant case, Judge Smith testified that individuals arrested for public drunkenness appear an average of 10 times a year; many appear as many as 20 times a year. Defendant Hill has been convicted of the crime of public intoxication 98 times. The total annual cost to the city, county, and state for handling King County's alcoholics is approximately $3,500,000. It is apparent that if society derives any benefit from our present policies regarding alcoholics, it is not worth the price we are paying for it.

Even granting, however, that criminally punishing alcoholics is extremely *undesirable,* the question remains: is it *unconstitutional* to prosecute chronic addictive alcoholics for exhibiting symptoms of their disease in public? I think the answer is yes.[3]

The eighth amendment to the United States Constitution states:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

The cruel and unusual punishment principles of this amendment have been made applicable to the states through the fourteenth amendment to the United States Constitution. *Robinson v. California,* 370 U. S. 660 (1962); *Louisiana ex rel. Francis v. Resweber,* 329 U. S. 459 (1947). Moreover, the Washington State Constitution has a similar provision, Const. art. 1, § 14:

Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted.

I believe both of these constitutional provisions prevent prosecution of defendant under the facts in the instant case.[4]

---

[3]Judge John M. Murtagh has criticized the few courts which have considered this issue for drawing it too narrowly. J. Murtagh, *Arrest for Public Intoxication,* 35 Fordham L. Rev. 1, 9 (1966). As he correctly points out, by restricting the issue to *chronic addictive* alcoholics, many individuals are excluded who are deserving of the same considerations. While I tend to agree with Judge Murtagh, however, practicalities would seem to prevent a broader holding at this time. In the first place, defendant *is* a chronic addictive alcoholic, so no broader holding is indicated. In the second place, Dr. Pattison pointed out that while chronic alcoholism is readily subject to diagnosis, lesser degrees of alcoholism are more difficult to diagnose. For these reasons, the dissent is restricted to the issue as presented.

[4]In considering whether U.S. Const. amends. 8, 14 and/or Const. art. 1, § 14 have been violated or abridged, it should be kept in mind that we have bound ourselves to apply, when considering our own constitution, interpretations by the United States Supreme Court of federal constitutional questions when the Washington State Constitution contains a similar provision. *Tacoma v. Heater,* 67 Wn.2d 733, 409 P.2d 867 (1966); *State v. Schoel.* 54 Wn.2d 388, 341 P.2d 481 (1959).

The United States Supreme Court devoted considerable attention to the meaning of cruel and unusual punishment in the case of *Trop v. Dulles*, 356 U. S. 86 (1958), involving denationalization under the Nationality Act of 1940. The court stated, *id.* at 99:

> The exact scope of the constitutional phrase "cruel and unusual" has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. . . . The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards.

The court went on to add a very important sentence, *id.* at 101:

> The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

In *Robinson v. California*, 370 U. S. 660 (1962), the Supreme Court had an opportunity to apply these principles to a problem more closely analogous to the one now before us. *Robinson, supra,* concerned a California statute which penalized individuals for using, or being addicted to the use of, narcotics. In other words, this statute penalized individuals because of their status as narcotics addicts. The Supreme Court held that the California statute inflicted cruel and unusual punishment and was thus unconstitutional. While narcotics addiction and alcohol addiction differ in some respects,[5] as do the facts of the two cases, much of the language of the court in *Robinson* seems appropriate here, *id.* at 666:

> It is unlikely that any State at this moment in history would attempt to make it a *criminal offense* for a person to be mentally ill, or a leper, or to be afflicted with a

---

[5]There was evidence before the court in *Robinson* that drug addiction may be contracted innocently, *e.g.,* from the use of medically prescribed drugs, or involuntarily, *e.g.,* children born of narcotics addicts. No similar evidence is before our court concerning alcohol addiction.

venereal disease. A State might determine that the general health and welfare require that the victims of *these and other human afflictions* be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. *But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment* in violation of the Eighth and Fourteenth Amendments. (Italics mine.)

It is important, I think, to note that the standards by which we judge what constitutes cruel and unusual punishment vary with the offense committed. This court has stated, *State v. Fairbanks*, 25 Wn.2d 686, 689, 171 P.2d 845, 847 (1946):

[D]uration of imprisonment fixed as a penalty may be *so incommensurate with the gravity of the offense* committed as to be violative of . . . [the cruel punishment] provision of the state constitution and of the kindred provision contained in the eighth amendment to the Federal constitution. (Italics mine.)

This same principle was phrased by the Supreme Court in *Robinson, supra,* at 667, in this way:

To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. *But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the "crime" of having a common cold.* (Italics mine.)

Two federal courts of appeal recently concluded that the principles espoused in *Robinson* apply to public drunkenness prosecutions of alcoholics. They held that it is cruel and unusual punishment to *criminally* penalize a chronic alcoholic for his involuntary public displays of drunkenness. *Easter v. District of Columbia*, 361 F.2d 50 (D. C. Cir. 1966);[6] *Driver v. Hinnant,* 356 F.2d 761 (4th Cir. 1966).

---

[6] In *Easter*, the court's determination was based principally upon a congressional act which establishes a program for rehabilitating alcoholics in the District of Columbia. Four members of the court went on, however, and, relying somewhat upon the reasoning in *Driver v. Hinnant, infra,* stated: "Our decision would be the same were we without the guidance furnished by the Act of 1947." 361 F.2d at 53.

Although the majority choose to summarily dismiss these cases, I find them most persuasive. To my mind, the punishment inflicted on chronic addictive alcoholics under the ordinance in the instant case is no less cruel than that inflicted on narcotics addicts under the statute in *Robinson, supra*. While the cases may be factually distinguishable, the *principles* stated in *Robinson, which we have bound ourselves to follow, see* note 4 *supra*, directly apply to the instant matter. Medical testimony and authorities unequivocally state that alcoholism is a disease, a "human affliction," which should be treated medically rather than punished criminally. There is undisputed testimony in the instant case that public drunkenness, the crime with which defendant is charged, is, for chronic addictive alcoholics like defendant, involuntary—it is a natural concomitant of their disease. In my judgment, the ordinance in question fosters a system which, in the instant case, results in the infliction of cruel and unusual punishment contrary to our state and federal constitutions.

The majority would distinguish the instant case from *Robinson v. California, supra*, on the ground that the ordinance in the instant case does not punish chronic addictive alcoholics because they are afflicted but rather because of their conduct. However, such a distinction, it seems to me, is simply too transparent to lend consequential support to defendant's conviction. Seattle ordinance No. 16046, § 1, Seattle City Code § 12.11.020, the ordinance in question, states that "[i]t shall be unlawful for any person to be guilty of . . . drunkenness," and drunkenness is a symptom of the disease of chronic addictive alcoholism. While the majority have construed this ordinance to apply only to *public* drunkenness, the fact remains that chronic addictive alcoholics characteristically exhibit the principal symptom of their disease—drunkenness—in public through no fault of their own. I can see no rational basis for disallowing punishment of individuals because they are ill but approving their punishment for involuntarily exhibiting a symptom of their illness.

The majority point out that in this state we follow the rule that an individual is responsible for his criminal acts unless he is unable to comprehend the moral quality of his acts or distinguish between right and wrong. *State v. White*, 60 Wn.2d 551, 374 P.2d 942 (1962). Since defendant does not contend that he falls within this rule, *i.e.*, that he is insane, the majority conclude defendant's volitional inabilities will not save him. However, the conclusion does not follow from the premise.

In general, to hold an individual responsible for a criminal act there must be both actus reus and mens rea. In other words, there must be both a voluntary criminal act and intent to commit a crime. H. Foster, *What Psychiatrists Should Know About the Limitations of Law*, 1965 Wis. L. Rev. 189, 226. While this court has held that the legislature has the power to remove mens rea requirements from crimes, so that criminal intent is no longer a factor, *State v. Lindberg*, 125 Wash. 51, 215 Pac. 41 (1923), we have never held that the requirement of a *voluntary* act is unnecessary, except in murder cases. *Cf. State v. Harris*, 57 Wn.2d 383, 357 P.2d 719 (1960); *State v. Sweetman*, 138 Wash. 366, 244 Pac. 732 (1926). *See generally* R. Perkins, Criminal Law 652-55 (1957).

Insanity is a defense because one legally insane cannot comprehend or distinguish between particular moral values. In other words, there can be no mens rea. This rule says nothing about the requirement of actus reus, however, for it assumes insane individuals act *voluntarily*, if not with understanding. Thus the insanity limitation is not apposite.

If a chronic addictive alcoholic steals from a liquor store, in all probability this act is voluntary since stealing is not compelled by alcoholic addiction.[7] On the other hand, if a

---

[7] The majority at one point imply that, because "alcoholics have been known to commit serious crime," they are likely prospects for criminal activity and therefore ought to be locked away. Unfortunately, this is equally true of every class of individuals in society, and, in fact, chronic addictive alcoholics characteristically pose little if any threat to society. *See* D. J. Pittman and C. Gordon, Revolving Door: A study of the Chronic Police Case Inebriate 41-52, 130-38 (1958).

chronic addictive alcoholic appears in public while intoxicated, in all probability this act is *not* voluntary since drinking is compelled by alcoholic addiction. In short, chronic addictive alcoholism would be a defense to a charge of public drunkenness because there is no actus reus, no voluntary act, but it would not be a defense to anything else.[8]

Much of what I believe to be the majority's confusion about the instant matter results from their initial failure to view chronic addictive alcoholism as a disease. I do not think the majority would hesitate to strike down an ordinance making it a crime for an epileptic to suffer a seizure in public, even though it would be possible, with extreme difficulty, for all epileptics to constantly remain indoors. This being so, I am unable to rationalize such a result with the result in the instant case. Alcoholics are as ill as epileptics, and constitutionally deserve the same considerations.

## III. SUMMARY AND CONCLUSION

Defendant is a chronic addictive alcoholic. Chronic addictive alcoholism is a disease which ought to be treated medically. Symptoms of chronic addictive alcoholism include an inability to refrain from drinking and an inability to stop drinking once started until intoxicated. Because of their social and economic disorientation, chronic addictive alcoholics characteristically are unable to prevent themselves from being drunk in public. For these reasons, I am convinced the Seattle ordinance which penalizes individuals who appear drunk in public is unconstitutional as applied to chronic addictive alcoholics, in that it subjects them to cruel and unusual punishment.

The majority suggest that any decision changing the current legal philosophy and approach respecting chronic addictive alcoholism would in any event be better left to the legislature. This argument is not without merit. There is

---

[8] It is for this reason, too, that RCW 9.01.114 (which disallows *voluntary* drunkenness as a defense to criminal acts) is irrelevant.

support for the view that, without legislation which provides a means of caring for chronic addictive alcoholics, they would not be aided to any significant extent by supplying them with a defense to a charge of public intoxication. In Report of the President's Commission on Crime in the District of Columbia 486-90 (1966), the Commission discusses developments in the District subsequent to *Easter v. District of Columbia*, 361 F.2d 50 (D.C. Cir. 1966). Its report is not encouraging. The District of Columbia government failed to respond in any significant manner to the decision, and as a result alcoholics, while no longer subject to the stigma of a criminal conviction, are still not helped. Arrest policies are still the same, no new facilities have been built, and in general things are almost as black as they were prior to *Easter*.

The Commission's report does indicate, however that other areas, such as St. Louis, have done more to aid alcoholics. Report of the D. C. Commission, *supra*, at 477. More importantly, for purposes of the instant case, King County has already initiated a program through the King County Sheriff, in cooperation with the King County Commissioners, which represents a most enlightened step toward aiding alcoholics.[9] While additional legislative help would no doubt be of great benefit to King County and the remainder of the state, [10] the fact remains that we are not faced with a situation like that existing in the District of Columbia.

[9] The King County Sheriff's Department has recently established the Cedar Hills Alcoholism Treatment Center. This facility can house 112 patients. The program under which individuals are committed to Cedar Hills, while still in its embryonic stages, is most encouraging. Alcoholics arrested in King County for public intoxication are carefully screened prior to trial. If they are in fact found to be alcoholics, the Seattle Municipal Court will sentence them for a period of 90 days, with a recommendation that the sentence be carried out at Cedar Hills. While forced rehabilitation may not be as conducive to favorable results as voluntary rehabilitation, this procedure is certainly more commendable than incarcerating alcoholics in jail.

[10] It should be noted that there is some additional legislative aid supplied by RCW 70.96. This chapter establishes a statewide program for assistance in development and operation of public and private facilities for referral, care, custody, treatment, recovery, and rehabilita-

The considerations just mentioned, however, are in many respects irrelevant to the instant decision. Whether or not the legislature would meet its responsibilities if the ordinance were found unconstitutional as applied to chronic addictive alcoholics is hardly an ultimately compelling concern for the judiciary. The fact, too, that such a decision would not be a panacea for all of society's problems with alcoholism does not seem particularly pertinent either. If, after balancing valid competing interests, an ordinance is found to be unconstitutional, courts must rectify the situation. When a class of individuals is being subjected to cruel and unusual punishment because of a particular legislative act, courts, in neutralizing the effects of this act, should not indulge themselves the luxury of contemplating whether their judicial obligations would be more easily dischargeable or less painful to execute if there were additional legislation to fill the void left by their actions.

For the reasons stated in the foregoing opinion, I would reverse the judgment below and dismiss the case.

ROSELLINI, J., concurs with FINLEY, C. J.

HAMILTON, J. (concurring in the dissent)—I concur with the views expressed by Chief Justice Finley insofar as those views erect chronic addictive alcoholism as a legal excuse or defense to the particular crime of passive public intoxication. I do not perceive that such a holding projects chronic addictive alcoholism so far into the area of criminal defense law as would, under all circumstances, render it an excuse or a complete defense to any and all other crimes that might be committed by one suffering from the manifestations of the malady. Although the character of the

---

tion of alcoholics. In 1967 the legislature appropriated $1,000,000 for use by the Department of Health, and in addition transferred to the Department of Health 20 per cent of the funds derived from beer and wine licenses solely to carry out the purposes of RCW 70.96.085. Laws of 1967, Ex. Ses., ch. 75. These expenditures may reflect legislative recognition of the state's responsibility for problems caused by sales of alcoholic beverages—sales in which the state engages at enormous profits.

malady, and the dialogue surrounding it, tends to equate it with the seldom recognized, yet existent, criminal defense of involuntary intoxication, in my view, the malady still possesses sufficient facets of voluntariness to subject the addict to criminal liability and punishment for activities springing from and going beyond the basic symptom of passive intoxication—*e.g.*, disorderly behavior, drunken driving, assault, larceny, burglary, et cetera—upon the same basis as one who commits such crimes while voluntarily under the influence of intoxicants.

By way of analogy, an epileptic would certainly be legally excused from a disorderly conduct charge growing out of the bare fact that he suffered a convulsion upon a public street; yet, if in some stage or in some form of a convulsion he committed an assault or a homicide his criminal responsibility therefor would be measured by the rules pertinent to the mentally deranged.

The argument that the legislature must act upon this matter before the courts may intercede is, to my mind, softened somewhat by the steps which the legislature has already taken in the field of alcoholism. *See*, RCW 70.96[11] (dealing with the rehabilitation of alcoholics) and RCW 71.08 (dealing with habitual drunkenness). Certainly, these statutes are evidence of the public and legislative awareness of and concern for the problem created by chronic addiction—a problem which, incidentally, is hardly alleviated or diminished by the state's revenue gathering sale of intoxicants. Furthermore, RCW 71.08.010 (providing punishment for public intoxication) and RCW 9.01.114 (relating to intoxication as a defense in criminal prosecutions) definitely speak in terms of *voluntary* intoxication. These latter statutes make no mention and offer no precise circumscriptions upon a passive state or condition of intoxication induced by an *involuntary* submission to the demands of a chronic addictive malady. We, then, as a court, no

---

[11] As implemented by Laws of 1967, Ex. Ses., ch. 75, § 1, devoting a portion of liquor revenues to the establishment of rehabilitation facilities for alcoholics.

more invade legislative prerogatives in recognizing, as a matter of procedural criminal process and in a limited form of legal excuse, the established medical and psychiatric link between passive public intoxication and chronic addictive alcoholism, than we do when we judicially compose and/or modify the M'Naughton or Durham rules with respect to the criminal defense of insanity. The same, in a slightly different context, may be said of the judicial formulation, modification or elimination of such defenses in the area of civil litigation as governmental or charitable immunity, contributory or comparative negligence, and assumption of risk or volenti non fit injuria, albeit we seek sustenance for our actions in these respects upon the basis of the march of the common law rather than upon the advancement of social and medical science.

Moreover, if we conceive that criminal punishment of a chronic addictive alcoholic for the passive though public manifestation of his malady is at odds with constitutional concepts of due process or cruel and unusual punishment, then it is our duty as an appellate court to declare, under appropriate circumstances, the proscriptions of the constitution for the benefit of the legislative arm, rather than await extensive and mayhaps invalid legislative interpretation and implementation.

It is upon the basis of the foregoing views that I disagree with the majority's disposition.