**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| GARY SULLIVAN and FARIBA DANESHGARAN, | No. 85804-1-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| KING COUNTY, KING COUNTY HEARING EXAMINER, REGIONAL ANIMAL SERVICES OF KING COUNTY, | |
| Respondents. | |

FELDMAN, J. — Gary Sullivan and Fariba Daneshgaran (collectively Appellants) appeal from the superior court's denial of a writ directed to the King County hearing examiner who upheld a Regional Animal Services of King County (RASKC)[1] removal order for Appellants' dog, "Roxy." Because Appellants fail to establish an entitlement to relief, we affirm.

I

In January 2022, Roxy broke the tether securing her to a railing in front of Appellants' home and attacked neighbor Kevin Collins's dog, "Klaus," as he walked by with Collins's 12-year-old son, A.C. After this incident, RASKC issued a notice

---

[1] RASKC is "the agency authorized to . . . enforce animal care and control laws within the city of Bellevue." Bellevue Municipal Code 8.04.010.

of violation to Sullivan under former Bellevue Municipal Code (BMC) 8.04.300.H (2010), which declares as a public nuisance and violation of Bellevue's animal code "[a]ny animal that has exhibited vicious propensities and constitutes a danger to the safety of persons or property off the animal's premises or lawfully on the animal's premises." Based on this violation and corresponding risk of harm, RASKC ordered Sullivan to, among other things, "[s]ecure [Roxy] in a fenced area suitable for [her] size . . . when [Roxy] is unattended and outside your home [and l]ock all passages with a padlock to prevent accidental release" (confinement order).

Two additional violations followed shortly thereafter. The second violation occurred a few months later when RASKC issued another notice of violation to Sullivan under former BMC 8.04.300.H following a March 27, 2022 incident in which Roxy, while on a walk with Appellants, pulled her leash out of Daneshgaran's hand and bit a second dog. The third violation occurred on September 1, 2022, when Collins reported to RASKC that Roxy had "escaped from [Appellants'] backyard, and chased down [Collins's other] son who was walking . . . Klaus[ ] and attacked Klaus." Following an investigation, RASKC issued another notice of violation to Sullivan accompanied by an order directing that Roxy be removed from King County within 48 hours (removal order).

Appellants appealed the September 2022 notice of violation and removal order to the hearing examiner. On March 6, 2023, after a hearing, the hearing examiner issued a report and decision upholding both the notice of violation and the removal order. Nonetheless, the hearing examiner (1) reduced the monetary

penalty for the violation, (2) altered the scope of the removal order so that Sullivan was required to either surrender Roxy to RASKC or remove Roxy only from unincorporated King County and from cities "where the same legal standard applies and where Animal Services (and [the King County hearing examiner] as the reviewing tribunal) have authority," and (3) gave Sullivan more time to comply.

 On April 4, 2023, Appellants petitioned the superior court to issue either a statutory or constitutional writ and reverse the hearing examiner's report and decision.  The superior court concluded that "a writ should not issue" and dismissed the matter with prejudice.  This timely appeal followed.[2]

II

Appellants do not dispute that the confinement order directed Sullivan to secure Roxy in a fenced area when she was unattended and outside their home and, critically, to "[l]ock all passages with a padlock to prevent accidental release." They also do not dispute that on September 1, 2022, their backyard gate was not padlocked, and Roxy escaped through it while unattended in the backyard.  Nor do they dispute that both Bellevue's animal code and the King County Code require removal where, as here, an animal owner or keeper "[f]ail[s] to comply with any requirement prescribed by" RASKC.  Former BMC 8.04.370.A.3 (2010)[3]; former

---

[2] Appellants' petition also asserted a claim for declaratory relief.  They do not assign error to the superior court's dismissal of that claim, so we do not address it.

[3] Former BCC 8.04.370.A.3 states:  "Failure to comply with any requirement prescribed by the manager in accordance with this section constitutes a misdemeanor.  Such an animal shall not be kept in the city of Bellevue after 48 hours after receiving written notice from the manager.  Such an animal or animals found in violation of this section shall be impounded and disposed of as an unredeemed animal and the owner or keeper of the animal or animals has no right to redeem the animal or animals."

KCC 11.04.290.A.3 (2010).[4] They nevertheless claim that the superior court erred, first, by denying their petition for a statutory writ of review and, second, by denying their petition for a constitutional writ of review. Both arguments fail, for essentially the same reasons.

### A

We review de novo a superior court's decision whether to grant a statutory writ. *City of Seattle v. Holifield*, 170 Wn.2d 230, 239-40, 240 P.3d 1162 (2010). A superior court may grant a statutory writ only when "an inferior tribunal has (1) exceeded its authority *or* acted illegally, and (2) no appeal nor any plain, speedy, and adequate remedy at law exists." *Id.* at 240; RCW 7.16.040. The County concedes that Appellants had no right to appeal or any plain, speedy, and adequate remedy at law. Meanwhile, Appellants do not claim that the hearing examiner exceeded his authority. Thus, the sole issue before us is whether the hearing examiner acted illegally. Appellants assert that the hearing examiner acted illegally because he committed probable error for four discrete reasons. *See Holifield*, 170 Wn.2d at 244 (inferior tribunal acts illegally by, among other things, committing probable error that substantially alters the status quo). As discussed below, none of those reasons is persuasive.

### 1

Appellants first argue, invoking the "rule of lenity," that the hearing examiner

---

[4] Former KCC 11.04.290.A.3 states: "Failure to comply with any requirement prescribed by the manager in accordance with this section constitutes a misdemeanor. Such an animal shall not be kept in unincorporated King County after forty-eight hours after receiving written notice from the manager. Such an animal or animals found in violation of this section shall be impounded and disposed of as an unredeemed animal and the owner or keeper of the animal or animals has no right to redeem the animal or animals."

probably erred to the extent he did not construe in their favor the phrase "failure to comply" in former BMC 8.04.370.A.3 and former KCC 11.04.290.A.3 (quoted in footnotes 3-4 above). Even if we assume (without deciding) that this proceeding implicates the rule of lenity despite being civil and not criminal in nature, *see State v. Datin*, 45 Wn. App. 844, 845, 729 P.2d 61 (1986) ("rule of lenity is properly applied in construing an ambiguous criminal statute, requiring the interpretation most favorable to the defendant"), Appellants' reliance on the rule of lenity is misplaced.

"[C]ourts may apply the rule of lenity only where a statute is ambiguous such that 'it is subject to two or more reasonable interpretations.'" *State v. Vanslyke*, 28 Wn. App. 2d 483, 489, 536 P.3d 1155 (2023) (quoting *State v. McGee*, 122 Wn.2d 783, 787, 864 P.2d 912 (1993)). Here, Appellants do not argue much less show that the phrase "failure to comply" is subject to multiple reasonable interpretations. Instead, they assert that "the spectrum of behaviors *that may produce such failure* . . . are unknown." (Emphasis added.) But the fact that the at-issue ordinances are agnostic to the *cause* of a particular failure does not render them ambiguous. Accordingly, the rule of lenity does not apply here, and the hearing examiner did not commit probable error by purportedly failing to construe "'failure to comply" in Appellants' favor.

2

Appellants next argue the hearing examiner probably erred by upholding the removal order without evidence that they "<u>knowingly</u> or with criminal <u>negligence</u> failed to comply." Although it does not appear that Sullivan was criminally charged,

Appellants point out that the at-issue ordinances make failure to comply with RASKC requirements a misdemeanor. *See* former BMC 8.04.370.A.3; former KCC 11.04.290.A.3. They assert that "any criminal prosecution for failure to comply with a confinement order requires some culpable *mens rea*" and that the at-issue ordinances therefore do not (and cannot) impose strict liability. We disagree.

Legislative bodies "may create 'strict liability offenses to protect the public from the harms that have come with modern life by putting the burden of care on those in the best position to avoid those harms.'" *State v. Christian*, 18 Wn. App. 2d 185, 210, 489 P.3d 657 (2021) (quoting *State v. Blake*, 197 Wn.2d 170, 179, 481 P.3d 421 (2021)). Thus, determining whether a statute imposes strict liability is a question of legislative intent, and where, as here, the at-issue statutes do not specify a mental element, courts discern that intent by considering the eight *Bash*[5] factors:

> (1) whether there is an antecedent or analogous common law offense and its mens rea element; (2) whether the crime can be characterized as a "public welfare offense"; (3) the extent to which a strict liability reading of the statute would encompass seemingly innocent conduct; (4) the harshness of the penalty imposed for the offense; (5) the seriousness of the harm to the public; (6) the ease or difficulty of the defendant ascertaining the true facts; (7) whether a mens rea requirement would make proof of fault overly difficult and time consuming; and (8) the number of prosecutions to be expected.

*State v. Burch*, 197 Wn. App. 382, 393, 389 P.3d 685 (2016). Appellants assert that the first and last factors are inapplicable or "unknown." But they claim the

---

[5] *State v. Bash*, 130 Wn.2d 594, 925 P.2d 978 (1996) (plurality opinion).

remaining six factors favor non-strict liability. Properly applied, each of those factors favors strict liability.

With regard to the second *Bash* factor, the Bellevue animal code and its King County counterpart describe their purpose in terms of public welfare, declaring that it is public policy "to secure and maintain such levels of animal care and control as will protect animal and human health and safety, and to the greatest degree practicable to prevent injury to property and cruelty to animal life." BMC 8.04.050.A; former KCC 11.04.010.A (2010). These provisions also state that their purposes include providing "a means of . . . controlling errant animal behavior so that it shall not become a public nuisance." BMC 8.04.050.A; former KCC 11.04.010.A (2010). These statements of policy and purpose indicate that the offenses defined in these codes are public welfare offenses. *Cf. City of Seattle v. Hill*, 72 Wn.2d 786, 796, 435 P.2d 692 (1967) (concluding that an offense was a public welfare offense where it fell "within that category of offenses defined to preserve the public peace, health, welfare and morals and protect the citizenry from affront, nuisance and danger").

As to the third factor—whether the offense sweeps up seemingly innocent conduct—Appellants assert that their conduct was "entirely innocent" because it constituted an omission, i.e., failure to padlock their gate. But this is not a situation, as described in *Bash*, where the at-issue ordinances would not put dog owners and keepers on sufficient notice of the likelihood of regulation if it were interpreted as a "first bite" statute, i.e., "one which imposes criminal liability without regard to any previous classification of the dog." 130 Wn.2d at 602, 608. To the contrary,

the conduct at issue cannot reasonably be considered innocent given that at the time of their omission, Appellants were aware of the confinement order and the incident that triggered it. This factor, too, favors strict liability.

As to the fourth factor—the harshness of the penalty—the fact that a failure to comply is classified as a misdemeanor (as distinct from a felony) weighs in favor of strict liability. *See State v. Yishmael*, 195 Wn.2d 155, 170, 456 P.3d 1172 (2020) (fact that first offense for unlawful practice of law constitutes a misdemeanor "weighs in favor of a strict liability offense"); *Christian*, 18 Wn. App. 2d at 218 (fact that crime of interfering with reporting domestic violence is a gross misdemeanor carrying a maximum potential penalty of 364 days of jail weighs in favor of strict liability). Appellants assert that in evaluating this *Bash* factor, we must consider removal as "worse than standard misdemeanor fines and imprisonment." They cite no authority for this proposition, and they noticeably stop short of saying they would endure misdemeanor convictions to keep Roxy in their home.[6]

As to the fifth factor, Appellants argue that "[n]oncompliance with a confinement order is not the same as a finding that a dog has mauled or killed a person or animal . . . , and the facts indicate that Roxy caused no harm to any person or animal on [September 1, 2022]." But the record reflects that during the September 1, 2022 incident, Roxy stalked Klaus and then bit him on the neck without provocation. Furthermore, the strict liability question is one of legislative intent, and Appellants do not persuade us that the drafters of the relevant ordinances would not have considered a dog that has attacked and bitten other

---

[6] Instead, they say only that they "would almost surely take lumps as a misdemeanant" to keep Roxy at home, "[w]ithout, of course, inviting prosecution."

dogs to be a serious danger to the public merely because that dog has not previously "mauled or killed a person or animal."

As to the sixth and seventh *Bash* factors—the ease or difficulty of the defendant ascertaining the facts and whether a mens rea requirement would make proof of fact overly difficult and time consuming—Appellants concede that "[g]enerally speaking, confirming that a gate is padlocked is not a burdensome endeavor." They also concede that strict liability is favored "[w]here defendants could easily claim another reason for their conduct." To this end, were we to read a knowledge or criminal negligence requirement into the at-issue ordinances as Appellants urge us to do, a defendant in Sullivan's position could easily avoid liability by claiming they reasonably believed someone else had padlocked the gate or did not know that they were out of compliance.

In sum, the *Bash* factors weigh in favor of strict liability, and Appellants fail to show that the hearing examiner probably erred by failing to fashion and apply a mens rea requirement.

3

Appellants further argue the hearing examiner probably erred by failing to properly apply superseding cause principles. Daneshgaran testified before the hearing examiner that the evening before Roxy's escape, Daneshgaran told a house cleaner, "Please lock the door" as she left. Relying on the doctrine of superseding cause, Appellants argue that "the [house cleaner] broke the chain of causation and, by *that person's failure* (not [Appellants']), the confinement order was violated." Thus, they assert, "the evidence does not support that Appellants

'failed to comply' with any provision." But the confinement order directed *Sullivan* to "[l]ock all passages with a padlock to prevent accidental release." The superseding cause doctrine does not apply here, where the violation consisted of *Sullivan's* undisputed failure to comply with the applicable confinement order.

4

Finally, Appellants assert that in determining that removal was appropriate, the hearing examiner probably erred by not considering "the impact on the Appellants, and the availability of less-restrictive alternatives that could accommodate the interests of the Appellants, Complainants, and the community." But the hearing examiner did consider these matters. In particular, the hearing examiner noted that "we are most exacting of [RASKC] in removal cases," and he "appl[ied] a more robust analysis than simply that because Roxy violated the confinement order . . . , removal necessarily follows." He recognized "the strong bond" Appellants have with Roxy and found that they were "generally responsible owners" and had taken "significant steps before September, and have taken significant steps since then, to contain Roxy." He considered the facts underlying the January 2022 incident that led to the confinement order, and while he noted that it was unclear which dog bit A.C. that day, he found that Roxy was responsible "for perpetrating the attack that resulted in those injuries."[7]

Equally important, the hearing examiner also observed that while sometimes there are only two incidents—one that triggers a confinement order and

---

[7] For this reason, and also because the record shows that A.C. suffered puncture wounds, CP at 512, it is immaterial that, as Appellants correctly point out, the hearing examiner erred by stating that A.C. required stitches.

a second that triggers removal—here there were three, as Roxy had attacked another dog in March 2022.[8]  He observed further that while sometimes a dog violates a confinement order by merely getting loose and wandering the neighborhood without doing anything aggressive, "September 1 was the opposite. Roxy stalked, and then charged at and attacked, a dog several houses away, including biting the back of Klaus's head," and "[i]t took a good Samaritan to get Roxy's mouth from Klaus's head, and then to restrain Roxy from attacking again." He concluded this "cut[ ] strongly in favor of removal," and he noted that "the Collins family have been living in fear of the violent dog next to them."

In short, the hearing examiner considered and balanced the various interests at stake but ultimately determined that despite the measures Appellants had taken since January 2022, removal was appropriate due to the risk Roxy posed should she again escape.  While Appellants disagree with the hearing examiner's ultimate decision, they do not establish that the hearing examiner committed probable error.  And they likewise fail to show that the superior court erred in denying their request for a statutory writ of review.

B

Relying on the same four arguments discussed above, Appellants also argue that the superior court erred by denying their petition for a constitutional writ. But a constitutional writ is available only "in somewhat narrower circumstances"

---

[8] Appellants point out that the March 2022 incident "occurred while the first matter was pending appeal and the confinement order was stayed."  But the stay of the confinement order is irrelevant because the resulting violation was not based on the confinement order, but rather because Roxy "used force to escape its controller" and "inflicted a bite wound to the complainant's animal."

than a statutory writ, and whether to grant one "lies entirely within the trial court's discretion." *Clark County Pub. Util. Dist. No. 1. v. Wilkinson*, 139 Wn.2d 840, 845-46, 991 P.2d 1161 (2000). Having failed to show that the superior court erred in denying their petition for a statutory writ, Appellants also fail to show that the court abused its discretion in declining to issue a constitutional writ.

We affirm.

Feldman, J.

WE CONCUR:

Díaz, J.

Coburn, J.